180 N.J. Super. 350 (1981)
434 A.2d 1125
BROADWAY MAINTENANCE CORPORATION, PLAINTIFF-APPELLANT,
v.
RUTGERS, THE STATE UNIVERSITY, DEFENDANT-RESPONDENT. EDWIN J. DOBSON, JR., INC., PLAINTIFF-APPELLANT,
v.
RUTGERS, THE STATE UNIVERSITY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 18, 1981.
Decided August 10, 1981.
*352 Before Judges BISCHOFF, MILMED and FRANCIS.
*353 Charles H. Hoens, Jr. argued the cause for appellant Broadway Maintenance Corporation (Lum, Biunno & Tompkins, attorneys; Dennis J. Drasco and David C. Dreifuss, on the brief).
Julius L. Schapira, a member of the New York Bar (Greenberg, Trayman, Cantor, Reiss & Blasky) argued the cause for appellant Edwin J. Dobson, Jr., Inc. (Wilentz, Goldman & Spitzer, attorneys; Mr. Schapira, Jerome Reiss, Sharon Wirkus and Richard R. Bonamo, members of the New York Bar, on the brief).
Eugene J. Sullivan, Assistant Attorney General, argued the cause for respondent Rutgers, The State University (James R. Zazzali, Attorney General of New Jersey, attorney; John J. Degnan, former Attorney General of New Jersey; Mr. Sullivan and Mary C. O'Connell, Deputy Attorney General, on the brief).
PER CURIAM.
Plaintiffs Broadway Maintenance Corporation (Broadway) and Edwin J. Dobson, Jr., Inc. (Dobson), appeal from separate final judgments that in part dismissed certain claims plaintiffs asserted against Rutgers, The State University (Rutgers). The controversy arose over the construction of Rutgers Medical School, a proposed two-year project that ran about 25 months behind schedule. Broadway and Dobson claimed that Rutgers was responsible for this delay. The trial judge, in a decision reported at 157 N.J. Super. 357 (Law Div. 1978), held that most of the delay was the fault of another prime contractor and not Rutgers. For the reasons expressed below, we affirm the decision of the trial judge.
The facts of this case are fully set forth in 157 N.J. Super. at 364-368. The following is a brief summary of those facts. On October 31, 1966, following the receipt of bids, Rutgers awarded six prime contracts for the construction of its medical school. Of these six contracts three are important in this appeal: the contract for general construction awarded to Frank J. Briscoe Co., Inc. (Briscoe) for $7,392,000; the contract for electrical *354 work awarded to Broadway for $2,508,650; and the contract for plumbing and fire protection awarded to Dobson for $998,413. The contract documents for each contractor were basically the same. The second paragraph of the Form of Agreement called for the construction of the school to be completed in 700 days and stated time was of the essence. The same provisions were part of the General Conditions, see G4-F.4e and G4-F.1. See 157 N.J. Super. at 368-372. The project, however, ran considerably behind schedule. Numerous problems, most caused by Briscoe, contributed to this delay. These included the backfilling around the foundation walls and column footings with Brunswick shale, the slow concrete pouring of the eight towers, and the lack of temporary heat during the winters of 1967-1968 and 1968-1969. Part of the overrun can also be attributed to Rutgers' late and piecemeal delivery of equipment it undertook to furnish. As a result of these delays Briscoe, Broadway and Dobson filed complaints against Rutgers. On the eve of trial Briscoe and Rutgers settled. The Broadway and Dobson cases were consolidated and a 43-day trial ensued.
The trial ended on June 16, 1975. On January 12, 1978 the trial judge issued a written opinion, and on July 10, 1978 he signed two final judgments. By way of these judgments Broadway and Dobson received damages for some of their claims against Rutgers; for example, Broadway's increased costs of lighting fixtures, and Dobson's inspection and clearance of floor drains and installation of pipe inserts. Both parties received the balance due on their contracts plus interest and damages for disruption in their work due to Rutgers' late and piecemeal delivery of equipment. Similarly, both were awarded costs of suit. The judge, however, dismissed all other claims Broadway and Dobson made against Rutgers. Broadway and Dobson filed separate notices of appeal. The appeals were consolidated.
On appeal both plaintiffs contend that the trial judge erred in ruling that Rutgers did not have a duty to coordinate the work of the six prime contractors. They assert that such a *355 duty should be implied into these contracts. To support this proposition they rely on cases from other jurisdictions. See, e.g., Paccon Inc. v. United States, 399 F.2d 162 (Ct.Cl. 1968); L.L. Hall Construction Co. v. United States, 379 F.2d 559 (Ct.Cl. 1966); and Peter A. Camilli & Sons, Inc. v. State, 41 Misc.2d 218, 245 N.Y.S.2d 521 (Ct.Cl. 1963); Snyder Plumbing & Heating Corp. v. State, 21 Misc.2d 591, 198 N.Y.S.2d 600 (Ct.Cl. 1960). In the instant case, though, the duty to coordinate the project is governed by the plain language of the contract. The trial judge noted correctly that under the terms of the contract Briscoe was obligated to coordinate and supervise all construction work. The General Conditions, which were a part of all the contracts entered into between Rutgers and the prime contractors, contained a provision stating that Briscoe was to "assume overall and overriding responsibility for supervision, direction, and control of the production and assembly management of the building construction process." G4-L.1b. Briscoe's duty to coordinate was also expressed in G4-N.2:

OWNER'S RELIANCE UPON GENERAL CONTRACTOR: The Owner relies upon the organization, management, skill, cooperation, and efficiency of the General Contractor to supervise, direct, control and manage the General Construction work and the efforts of the other Contractors, so as to deliver the intended building conforming to the Contract and within the scheduled time.
and G4-N.3:

OTHER CONTRACTORS' RELIANCE UPON GENERAL CONTRACTOR: All other Contractors shall rely upon the organization, management, skill, cooperation and efficiency of the General Contractor to supervise, direct, control and manage the General Construction work and the efforts of the other Contractors so as to deliver the intended building conforming to the Contract and within the scheduled time.
These last two sections are strongly indicative of an understanding among all parties that Briscoe was to be responsible for coordinating the construction. See Kearny PBA Local # 21 v. Kearny, 81 N.J. 208, 221-222 (1979).
In connection with the duty to coordinate, Broadway and Dobson maintain that the trial judge mistakenly found that one prime contractor had the right to sue another prime contractor. This right played a pivotal role in the trial judge's determination *356 of who had the duty to coordinate, since coordination can only ultimately be achieved through some method of enforcement. We agree with the conclusion reached by the judge that one prime contractor could sue another prime contractor. We rest this decision on the premise that each prime contractor was an intended third-party beneficiary of the contracts entered into between the other prime contractors and the owner.
Third-party beneficiaries are categorized as either donee, creditor or incidental. The classification is used "to distinguish between the beneficiary who has a right of action under the contract, and the one who has not." Brooklawn v. Brooklawn Housing Corp., 124 N.J.L. 73, 76 (E. & A. 1940). Donee and creditor beneficiaries are usually seen as having a legal right to enforce a contract, while incidental beneficiaries benefit from the performance of a contract but usually cannot enforce it. Ibid. The key factor that determines what category a beneficiary falls into is the intent of the parties making the contract. Id. at 76-77; Gold Mills, Inc. v. Orbit Processing Corp., 121 N.J. Super. 370 (Law Div. 1972). In Gold Mills, Inc. the court said:
The essence of contract liability to a third party is that the contract be made for the benefit of said third party within the intent and contemplation of the contracting parties. Unless such a conclusion can be derived from the contract or surrounding facts, a third party has no right of action under that contract despite the fact that he may derive an incidental benefit from its performance. [at 373]
Cases from other jurisdictions illustrate the application of this principle to multi-prime contractor projects.
In Visintine & Co. v. New York, Chicago & St. Louis R. Co., 169 Ohio 505, 160 N.E.2d 311 (Sup.Ct. 1959), the State of Ohio entered into separate contracts with a railroad company and with Visintine for work on grade crossings. Visintine later brought suit against the railroad company for breach of contract. The court allowed the suit despite the lack of privity between the parties. It did so on the theory that Visintine was a creditor beneficiary of the contract between the railroad company and the State of Ohio. The Supreme Court of Ohio *357 approved of the following analysis made by an appellate judge in the case:
"... We are of the opinion that in considering the railroad contracts and the plans and specifications and sequence of work specifications it is apparent that it was intended to benefit the contractor, as they all provided for cooperation in order that the job might be completed as scheduled. .. . Throughout all contracts it was made plain that the work of Visintine was dependent upon the performance by the railroads of their contractual obligations and vice versa. By each performing their obligations in the proper sequence a benefit was incurred upon the other by permitting them to complete their work in accordance with the terms of their various contracts." [160 N.E.2d 314]
In M.T. Reed Constr. Co. v. Virginia Metal P. Corp., 213 F.2d 337 (5 Cir.1954), a general contractor brought an action against a contractor responsible for installing bookshelves in a building. Both had entered into separate contracts with the state building commission. In allowing one contractor to sue another the court said:
... we agree with the appellant [general contractor] that it was a direct beneficiary of the contract of appellee [bookshelf contractor] with the state building commission, which obligated the appellee to cooperate with appellant and coordinate its work with that of appellant so as to enable both of them to complete their respective jobs on time. The building could not have been completed without such mutual obligation on the part of each of the contractors, and the obligation so to do was a part of the consideration that induced each of the contractors to undertake its particular job at the agreed price. [at 338]
The contractual language used in the present case demonstrates that each prime contractor was an intended beneficiary of the contracts entered into between Rutgers and the other prime contractors. G4-D.1a states that "[e]ach Contractor shall coordinate his operations with those of other Contractors." G4-L.1b states that each contractor "shall cooperate and collaborate and coordinate all of his work with the General Contractor...." G4-N.2 states that the owner relies upon the General Contractor to coordinate the project; and G4-N.3 states that each contractor relies upon "the efforts of the other Contractors, so as to deliver the intended building conforming to the Contract and within the scheduled time." From this language it is clear that all contractors directly benefited from the performance of each other's contract. If one contractor failed to perform *358 the others would undoubtedly be delayed in their performance. Each contractor had a direct stake in the performance of all other contracts. Therefore, we conclude that Broadway and Dobson were intended third party beneficiaries of the Briscoe-Rutgers contract, and as such they could sue Briscoe for its failure to perform.
Broadway and Dobson next contend that Rutgers breached its contract by failing to withhold funds from Briscoe. Section G4-D.1f of the General Conditions states:
In case the Contractor, by his own acts or the acts of any person or persons in his employ, shall unnecessarily delay, in the opinion of the Architect, the work of the Owner or other Contractors, by not properly cooperating with them or by not affording them sufficient opportunity or facility to perform work as may be specified, the Contractor shall, in that case, pay all costs and expenses incurred by such parties due to any such delays and he hereby authorizes the Owner to deduct the amount of such costs and expenses from any monies due or to become due the Contractor under this Contract, based on the investigations and recommendations of the Architect. Nothing contained in this paragraph shall, however, relieve said Contractor from any liability or damage resulting to the Owner on account of such delay or delays.
The trial judge construed this section
... as requiring the delayed contractor to request a determination to be made by the architect, during which process the delaying contractor would have the right to at least know what the claim is and the basis for it. The architect would then recommend to the owner what action to take. In the absence of any showing of compliance with said provision, Rutgers was under no duty to withhold an undetermined amount of money. [157 N.J. Super. at 425]
In the voluminous correspondence sent by Broadway and Dobson to the architect there is only one letter, sent by Dobson, requesting Rutgers to withhold funds from Briscoe for the latter's delay. No monies were withheld on this point, and the trial judge in his opinion determined that Rutgers was not liable for failing to withhold money pursuant to this request. 157 N.J. Super. at 429-430. Other than that letter neither party ever requested that Rutgers withhold funds from Briscoe pursuant to G4-D.1f. Rutgers cannot be found to have breached a contractual provision it was never asked to invoke.
Next, Broadway and Dobson assert that their claims for damages due to delay are not barred by G4-D.6b, which reads:

*359 No claim for damages or any claim other than for extensions of time as herein provided shall be made or asserted against the Owner by reason of any of the delays mentioned in this Contract.
Two of the delays mentioned in G4-D.6a are "acts of the Owner, [and] acts of another Contractor in the performance of a contract with the Owner...."
No damage for delay clauses are valid contractual provisions. Ace Stone, Inc. v. Wayne Tp., 47 N.J. 431 (1966); Gherardi v. Trenton Bd. of Ed., 53 N.J. Super. 349, 362-365 (App.Div. 1958); A. Kaplen & Son v. Passaic Housing Auth., 42 N.J. Super. 230 (App.Div. 1956); and Buckley & Co., Inc. v. State, 140 N.J. Super. 289 (Law Div. 1975). These clauses are strictly construed against the drafter and exceptions are often read into them. Ace Stone, supra, 47 N.J. at 434. Examining no damage for delay clauses in light of specific exceptional situations, such as delay not contemplated by the parties, abandonment of the project or active interference or bad faith, see A. Kaplen & Sons, supra, 42 N.J. Super. at 234, has for the most part been abandoned in favor of "... a single inquiry into the intention of the parties." Buckley & Co., Inc., supra, 140 N.J. Super. at 299.
In the present case Broadway and Dobson seek a determination that the backfill problem, the slow pouring of the concrete and the lack of temporary heat for two winters are exceptional situations outside of the no damage for delay clause. We disagree. These problems are "the ordinary and usual types of delay with which most contractors are frequently confronted." Gherardi, supra, 53 N.J. Super. at 365. At a minimum the parties had to intend to include these types of delay in the no damage for delay clause.
The next contention raised by Broadway is that Rutgers is liable for the improper acts of the architect, its agent. Broadway asserts that Rutgers is liable for "[t]he Architect's failure to act reasonably in connection with coordination of construction, ... the withholding of funds ... and extensions of time...." We find no merit in this contention for several reasons. First, coordination of the project was the duty of *360 Briscoe, not the architect. Second, as pointed out above, Broadway and Dobson failed to request a withholding of funds; therefore there can be no liability for failure to withhold. And finally, the trial judge ruled with respect to extensions of time that "Dobson and Broadway are entitled to extensions of time at least equal to what is necessary to offset [Rutgers'] claim for liquidated damages." 157 N.J. Super. at 420.
The last issue raised concerns Rutgers' hold on Broadway's switchgear. On October 5, 1966 Broadway received an oral quote of $525,000 on the switchgear. This offer was open for 30 days. This price was used by Broadway in formulating its bid, which, according to the Instructions to Bidders, was to remain open for 60 days. Rutgers accepted Broadway's bid on October 21, 1966. The first job meeting on the project was held on November 1, 1966. At its conclusion a representative of the architect told Broadway to hold off ordering the switchgear. According to the architect, Rutgers wanted more time to study a certain design feature that involved placement of the switchgear. When the hold was finally lifted, the 30-day oral offer had expired and Broadway had to purchase the switchgear for $588,500.
Broadway argues that Rutgers is liable for the difference in the price of the switchgear. According to Broadway, it had an enforceable right against Westinghouse for the $525,000 price on the basis of promissory estoppel, and Rutgers caused Broadway to lose that right. It accordingly maintains that Rutgers should therefore compensate Broadway for this loss.
There is, though, a flaw in this argument. The bid Rutgers received from Broadway was to remain open for 60 days. Without notice to the contrary from Broadway, Rutgers was entitled to put a hold on the switchgear within the 60 day period. It was reasonable for Rutgers to assume that any proposals or offers relied upon by Broadway in submitting its bid would be valid for 60 days, especially since Broadway never told Rutgers that the price of the switchgear quoted in the bid *361 was only good for 30 days. Therefore, we conclude that Rutgers is not liable for the increased cost of the switchgear.
Affirmed.