BROADWAY MAINTENANCE CORPORATION, PLAINTIFF-AP-
PELLANT, v. RUTGERS, THE STATE UNIVERSITY,
DEFENDANT-RESPONDENT.

EDWIN J. DOBSON, JR., INC., PLAINTIFF-APPELLANT, v.
RUTGERS, THE STATE UNIVERSITY,
DEFENDANT-RESPONDENT.

Argued April 19, 1982—Decided July 7, 1982.

*Richard R. Bonamo* argued the cause for appellant Edwin J. Dobson, Jr., Inc. (*Wilentz, Goldman & Spitzer,* attorneys).

*Charles H. Hoens, Jr.* argued the cause for appellant Broadway Maintenance Corporation (*Lum, Biunno & Tompkins,* attorneys; *Dennis J. Drasco* and *David C. Dreifuss,* on the briefs).

*Eugene J. Sullivan,* Assistant Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey; *Mr. Sullivan* and *Michael R. Cole,* Assistant Attorneys General, of counsel).

*Robert S. Peckar* submitted a brief on behalf of *amicus curiae* Building Contractors Association of New Jersey (*Peckar & Abramson,* attorneys).

*K. L. Estabrook* submitted a brief on behalf of *amicus curiae* Mechanical Contractors Association of New Jersey, Inc. (*Lindabury, McCormick & Estabrook,* attorneys; *Bruce P. Ogden,* on the brief).

The opinion of the Court was delivered by

SCHREIBER, J.

Two contractors engaged in the construction of the Rutgers Medical School in Piscataway Township sought to recover damages from Rutgers, The State University (Rutgers), for its failure to coordinate the project and to compel timely performance by a third contractor. Rutgers asserts that it allocated the

sole duty to coordinate the work of the prime contractors on the project and ensure their timely performance to Frank Briscoe Co., Inc. (Briscoe), its general contractor. Plaintiffs deny their right to sue Briscoe as third party beneficiaries of Briscoe's contract with Rutgers. We must determine first, whether plaintiffs were intended to be beneficiaries of that contract. Even if they were, we must determine whether Rutgers, as owner, retained any duty to coordinate or supervise which could give rise to a cause of action in plaintiffs. Finally, we must determine whether Rutgers is excused from any such liability by an exculpatory clause in the contract.

On October 31, 1966, Rutgers signed contracts for general construction work with Briscoe for $7,392,000, electrical work with plaintiff, Broadway Maintenance Corp. (Broadway), for $2,508,650, and plumbing and fire protection with plaintiff, Edwin J. Dobson, Jr., Inc. (Dobson), for $998,413. Six other contracts, also entered into, covered precast concrete; structural steel; elevators; heating, ventilating and air conditioning; laboratory furniture and independent inspection and testing.[1] In contrast with construction projects in which the owner contracts with a general contractor who undertakes the entire project and coordinates operations of subcontractors, Rutgers entered into contracts with each of several prime contractors. In Rutgers' agreement with Briscoe, Briscoe agreed to act as the supervisor on the job and coordinator of all the contractors.

After the work was finished, at a date well beyond the scheduled time for completion, Dobson and Broadway filed separate complaints against Rutgers in the Superior Court, Law Division, asserting a variety of claims, including damages due to delays and disruptions caused by Rutgers' failure to coordinate

---

[1] Rutgers apparently believed that it was subject to *N.J.S.A.* 52:32–2, which requires the letting of multiple contracts in connection with the construction of public buildings. This Court has since determined, however, that the statute does not apply to Rutgers. *Rutgers v. Kugler*, 58 *N.J.* 113 (1971), aff'g 110 *N.J.Super.* 424 (Law Div. 1970).

the activities of the various contractors on the site. Rutgers filed third party complaints seeking indemnification from Briscoe and its surety. The two actions were consolidated for trial with a pending third suit brought by Briscoe against Rutgers for money due under the Rutgers-Briscoe contract. Dobson and Broadway never added Briscoe as a party defendant in their actions. The suit between Rutgers and Briscoe was settled before trial, except for two claims for indemnification.[2] Briscoe is not a party to this appeal.

The non-jury trial proceeded for 43 days. Rutgers produced no evidence and rested at the end of plaintiffs' case. The trial court in an extensive written opinion granted plaintiffs judgments for some of their claims, but denied recovery against Rutgers for failure to coordinate the activities of the prime contractors, including Briscoe. 157 *N.J.Super.* 357 (Law Div. 1978). Dobson and Broadway appealed to the Appellate Division, which affirmed. 180 *N.J.Super.* 350 (App.Div.1981).

Each plaintiff petitioned for certification. We granted both petitions to consider three questions: (1) in a multi-prime contract, is each prime contractor liable to the other, (2) in such a contract, does the owner have a duty to coordinate the work of the contractors, and (3) does the exculpatory clause in the prime contracts at issue here shield Rutgers from liability for damages due to delay.[3] The Mechanical Contractors Association of New Jersey, Inc. and the Building Contractors Association of New Jersey were granted leave to file briefs as *amici curiae*.

---

[2] The Attorney General assumed the defense of the actions after Rutgers Medical School was transferred to the College of Medicine and Dentistry of New Jersey by the Medical and Dental Education Act of 1970, *N.J.S.A.* 18A:64G–1 *et seq. See Briscoe v. Rutgers*, 130 *N.J.Super.* 493 (Law Div. 1974) (motion to strike claims for damages on grounds of sovereign immunity denied).

[3] The petition for certification did not specify the third issue. However, it was added at oral argument and all parties filed supplemental statements on this issue.

# I

■ Dobson and Broadway contend that they were not third party beneficiaries of the contract between Rutgers and Briscoe so as to entitle them to sue Briscoe.[4] The principle that determines the existence of a third party beneficiary status focuses on whether the parties to the contract intended others to benefit from the existence of the contract, or whether the benefit so derived arises merely as an unintended incident of the agreement.[5]

In *Brooklawn v. Brooklawn Housing Corp.*, 124 *N.J.L.* 73 (E. & A. 1940), the Court of Errors and Appeals stated the proposition:

> The determining factor as to the rights of a third party beneficiary is the intention of the parties who actually made the contract. They are the persons who agree upon the promises, the covenants, the guarantees; they are the persons who create the rights and obligations which flow from the contract. . . . Thus, the real test is whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts; and the fact that such a benefit exists, or that the third party is named, is merely evidence of this intention. [*Id.* at 76–77]

■ The contractual intent to recognize a right to performance in the third person is the key. If that intent does not exist, then the third person is only an incidental beneficiary, having no contractual standing. *Standard Gas Power Corp. v. New England Casualty Co.*, 90 *N.J.L.* 570, 573–74 (E. & A. 1917). This is

---

[4]The reason they take this position is because the Appellate Division relied on their third party beneficiary status as a basis for finding that Rutgers intended to delegate the task of coordinating construction to Briscoe. Since Briscoe had a duty to plaintiffs to coordinate, the Appellate Division believed that plaintiffs could not sue Rutgers for any failure to coordinate. Plaintiffs assumed that any suit by them against Briscoe was time barred.

[5]The Legislature has acknowledged the right of "[a] person for whose benefit a contract is made, either simple or sealed, [to] sue thereon in any court. . . ." *N.J.S.A.* 2A:15–2. This statute confirmed the available legal remedy, long recognized in New Jersey, *see, e.g., Van Dyne v. Vreeland*, 11 *N.J.Eq.* 370, 379 (Ch.1857), and extended the rule to cover contracts under seal. *Holt v. United Security Life Insurance and Trust Co.*, 76 *N.J.L.* 585, 590 (E. & A. 1909).

the view espoused in *Restatement (Second) of Contracts* § 302 (1979). *See also* 4 *A. Corbin, Contracts*, §§ 772–81 (1951 & Supp.1980). Whether the third person is a creditor or donee of the contractual promisee is relevant only in ascertaining the intent of the contracting parties. The parties of course may expressly negate any legally enforceable right in a third party. Likewise they may expressly provide for that right. When the contract is silent, it is necessary to examine the pertinent provisions in the agreement and the surrounding circumstances to ascertain that intent. *Talcott v. H. Corenzwit & Co.*, 76 *N.J.* 305, 312 (1978).

Courts have reached different results in determining whether multi-prime construction contracts afford a third party a right to sue. The result depends on an analysis of the facts in each case. *Compare, e.g., Buchman Plumbing Co. v. Regents of University of Minnesota*, 298 *Minn.* 328, 215 *N.W.*2d 479 (1974) (suit not maintainable) and *Snyder Plumbing & Heating Corp. v. Purcell*, 9 *A.D.*2d 505, 195 *N.Y.S.*2d 780 (App.Div.1960) (suit not maintainable) *with J. Louis Crum Corp. v. Alfred Lindgren, Inc.*, 564 *S.W.*2d 544 (Mo.App.1978) (suit maintainable) and *KEC Corp. v. N. Y. State Environmental Facilities Corp.*, 76 *Misc.*2d 170, 350 *N.Y.S.*2d 331 (Sup.Ct.1973) (suit maintainable).

We are satisfied that the record supports the findings of the trial court that the respective parties agreed that prime contractors may have valid causes of action against each other for damages due to unjustifiable delay. The Instructions to Bidders alerted each prime contractor that Rutgers proposed to enter into nine separate prime contracts. The Contract Forms and General Conditions, which were delivered with the Instructions and incorporated by reference in the executed agreements with each prime contractor, contained the same provisions.

Each contract stressed that time was of the essence and that each contractor was to perform expeditiously in accordance with the schedule and under the general supervision of the general contractor. The General Conditions called for prompt perform-

ance and completion of the work. Set forth in capital letters was the command: "Time of performance and completion of work are of the essence of this contract." There then followed an admonition that since time was of the essence, rates of progress were to be established by the critical path method; [6] the contractor was to "prosecute regularly, diligently and uninterruptedly at such rates of progress as will insure full completion of [the] Contract within the specified date of completion." The responsibility was imposed on each contractor to cooperate with the critical path method scheduling consultant. Additionally, each contractor accepted the general contractor as the supervisor of the project and agreed to recognize, cooperate, collaborate and coordinate all its work with the general contractor. Each contractor promised that its work would "not interfere with or retard the progress of other work." Thus the parties conceived that the prime contractors would benefit from proper performance by their peers. The project could not have been finished without each contractor meeting its respective obligations. It is reasonable to conclude that the obligations of the others induced each contractor to undertake its job at the agreed price.

Most importantly, the contractor agreed that if it unnecessarily delayed the work of the other contractors, "the Contractor shall, in that case, pay all costs and expenses incurred by such parties due to any such delays and [it] hereby authorizes the Owner to deduct the amount of such costs and expenses from any monies due or to become due the Contractor under this Contract...." In this way the agreement expressly contemplated that failure to comply could cause damages to other prime contractors who in turn would be entitled to funds with-

---

[6]A critical path method is a construction schedule showing the separate elements of the work (electrical, plumbing, etc.), the period of time and sequence for the performance of each. An item that could delay the entire project is on the "critical path." The critical path consultant provides periodic updates that measure and show actual progress as compared to the original schedule.

held by Rutgers. Thus the parties to the contract expected monetary damages to be paid by other prime contractors whose improper performance caused delay. If a contractor were the wrongdoer, its reasonable expectation was to pay those damages. The promise to pay the damages of a fellow prime contractor is strong evidence that the injured prime contractor is an intended beneficiary who may enforce that promise. *See, e.g., Amelco Window Corp. v. Federal Insurance Co.*, 127 *N.J.Super.* 342 (App.Div.1974) (subcontractor held third party beneficiary of prime contractor's performance bond); *Joslin v. New Jersey Car Spring Co.*, 36 *N.J.L.* 141 (Sup.Ct.1873) (promise to pay foreman held part of purchase price of business); *Restatement (Second) of Contracts* § 313, Comment c (1979) (government contractors sometimes make explicit promises to pay damages to third persons, and such promises are enforced). The trial court's conclusion that the reasonable expectation of the contracting parties was that other prime contractors might sue for a failure to perform resulting in undue delay is fully supportable by the agreement.

The plaintiffs argue that this result conflicts with *Gherardi v. Trenton Board of Education*, 53 *N.J.Super.* 349 (App.Div.1958). In *Gherardi*, the Trenton Board of Education had entered into five prime contracts to construct a school. The general provisions in all contracts were the same. The architects had the duty to coordinate the work of the contractors and there was a clause exculpating the Board from liability for delay. Plaintiff, the general construction contractor, sued the architect and the other contractors for damages due to delay. The Appellate Division affirmed summary judgments for defendants, finding nothing in the contract that gave the plaintiff a "right over against a contractor who was unable to complete his work within the time required." *Id.* at 360. *Gherardi* is factually inapposite since in this case the contract expressly acknowledged a third party contractor's claims against another prime contractor.

As stated above, whether the third party may successfully maintain a cause of action depends upon the intent of the parties. This is a fact-sensitive issue and in each case the court must examine the terms and conditions of the agreement to determine whether the non-party to the contract was an intended or incidental beneficiary.

## II

The existence of a third party claim does not necessarily extinguish all claims between the parties to the contract. Here plaintiffs argue that Rutgers breached its agreement with them and is liable irrespective of any third party claims they may have against the general contractor, Briscoe. The plaintiff's contention is sound at least with respect to those matters that Rutgers had contractually obligated itself to do and for which it would be responsible. The trial court did award damages to the plaintiffs against Rutgers for certain contractual breaches. Rutgers has not appealed from those determinations.

The narrow questions before us on this appeal are whether Rutgers had agreed to synthesize the operations of the prime contractors, including Briscoe, and, if so, whether Rutgers breached that duty and would be liable for the delay flowing from that breach. The order granting the petitions for certification was limited to the subject matter of coordination of the operations of all the prime contractors including Briscoe. Damages flowing therefrom involve only delay on the job and its consequential costs.

Plaintiffs urge various claims that they relate to delay such as additional expenses incurred because of lack of elevators and stairs. These particular claims were disallowed by the trial court, which pointed out, among other things, that Briscoe's delay did not cause the asserted damages. Though these items are not before us on this appeal, we have reviewed the record

and are satisfied that the trial court's findings have adequate factual support.[7]

---

[7]It is informative to note the nature of the claims advanced at the trial and their disposition. The following table sets forth the claims adjudicated in favor of and against the plaintiffs:

### Dobson

Judgments against Rutgers for:

| | |
|---|---|
| Installing and cleaning drains | $ 2,187.00 |
| Installing pipe inserts | 17,616.50 |
| Balance due on contract | 6,352.19 |
| Interest on retainage | 2,371.91 |
| Damages from late delivery of equipment by Rutgers | 53,243.00 |

Claims dismissed:

| | |
|---|---|
| Drilling holes in panels | $ 2,080.00 |
| Bank-run gravel | 30,930.00 |
| Draining and reactivating water system | 3,714.29 |
| Delay and disruption | 362,834.44 |

Dobson was held to be entitled to extensions of time at least equal to what is necessary to offset Rutgers' counterclaim for liquidated damages of $200 per day for failure to complete work within the time specified.

### Broadway

Judgment against Rutgers for:

| | |
|---|---|
| Increased cost lighting fixtures | $ 37,522.18 |
| Balance due on contract | 97,759.05 |
| Interest on retainage | 36,174.76 |
| Damages from late delivery of equipment by Rutgers | 44,714.69 |

Claims dismissed:

| | |
|---|---|
| Damage to equipment due to failure to coordinate | $ 9,462.00 |

Delay costs:

| | |
|---|---|
| (a) Temporary light and power | 16,026.00 |
| (b) Increased wages | 26,815.00 |
| (c) Increased material costs | 74,723.00 |

Plaintiffs also continue to press before us matters such as Rutgers' alleged default in not withholding funds due Briscoe in order to satisfy plaintiff's claims for delay against Briscoe, and Rutgers' non-fulfillment of its supposed duty to place the site in condition so that plaintiffs could proceed. On this appeal we are concerned solely with the general supervision over the contractors. What duties Rutgers had in this respect depends upon what obligations were imposed upon it by the contract.

In the absence of any compelling public policy, an owner has the privilege to eliminate a general contractor and enter into several prime contracts governing the construction project.[8] In that event the owner could engage some third party or one of the contractors to perform all the coordinating functions. Where all the parties enter into such an arrangement the owner would have no supervisory function. The situation would be analogous to one where a general contractor had been engaged to construct the project on a turnkey basis. Surely the subcontractors would have no claim against the owner for failure to coordinate.

If no one were designated to carry on the overall supervision, the reasonable implication would be that the owner would perform those duties. In so doing, the owner impliedly assumes

---

| | |
|---|---|
| Cost of preparing claim | 42,250.00 |
| Switchgear | 73,025.00 |
| Lack of temporary heat due to failure to coordinate | 16,995.00 |
| Delay and disruption | 712,575.00 |

Broadway was also held to be entitled to extensions of time at least equal to what is necessary to offset Rutgers' counterclaim for liquidated damages of $200 per day for failure to complete work within the time specified.

[8]Use of multiple prime contracts assumes the owner will benefit from savings that will accrue from elimination of the overhead and profits of the general contractor. Provisions for construction of any public buildings by the State provide for separate bids for different major aspects of the job and bids for all work in one contract, the award to be made to whichever method results in a lower cost. *N.J.S.A.* 52:32–2.

the duty to coordinate the various contractors to prevent unreasonable delays on the project. *See, e.g., Born v. Malloy*, 64 *Ill.App.*3d 181, 184, 21 Ill.Dec. 117, 120, 381 *N.E.*2d 52, 55 (1978); *Carlstrom v. Independent School District No. 77*, 256 *N.W.*2d 479 (Minn.1977). That is a reasonable assumption because the contracting authority has the power to use its superior position and to invoke its contractual rights to compel cooperation among contractors. *Shea-S&M Ball v. Massman-Kiewit-Early*, 606 *F.*2d 1245, 1251 (D.C.Cir.1979). The owner is impliedly obligated to act in good faith and to do that which it reasonably can to ensure that the other contractors adhere· to the time schedules established for the project. *Paccon, Inc. v. United States*, 399 *F.*2d 162, 169–70 (Ct.Cl.1968). An owner's failure to take action in the face of unnecessary and unreasonable delays by one of the contracting parties would ordinarily evidence bad faith and constitute a breach of its implied duty to coordinate.

It is of course also possible that the owner might fractionalize those supervisory functions. Where the owner has chosen to engage several contractors directly, the bottom line is to ascertain who the parties agreed would orchestrate and harmonize the work. The answers may be found in the contract language as illuminated by surrounding circumstances.

The complications that arise in this case are due in part to the unclear nature of who was to perform what supervisory function. Briscoe had agreed to supervise the job generally. It was entrusted with the "oversight, management, supervision, control and general direction" of the project. It was to control "the production and assembly management of the building construction process." Briscoe was obligated to have sufficient executive and supervisory staff in the field so as to handle these matters efficiently and expeditiously. The General Conditions also recited that Rutgers relied upon Briscoe's management and skill to supervise, direct and manage Briscoe's own work and the efforts of the other contractors; indeed, the agreements stated that the contractors also relied upon Briscoe's supervisory powers to deliver the building within the scheduled time.

However, Rutgers also designated its Department of New Facilities to represent it in technical and administrative negotiations with the contractors and the Department could stop the work if necessary. Rutgers also selected a critical path method consultant whose progress chart was to be followed, but could be amended with the consultant's approval. Further, Rutgers engaged an architect. The architect agreed to "[s]upervise the construction of work by periodic inspections sufficient to verify the quality of the construction and the conformity of the construction to the plans and specifications . . . and by which supervision the architect shall coordinate the work of the various contractors and expedite the construction of the Project." If a contractor were delayed in completing the work whether due to the owner, any other contractor, the architect, or other causes beyond the contractor's control, the architect alone was authorized to determine extensions of time to which a prime contractor would be entitled. In this respect the trial court found that the architect acted as an impartial and independent umpire, and as such was not the agent of either Rutgers or the contractor.

Plaintiffs contend that Rutgers retained supervisory control because Briscoe had not been given the power to enforce its coordinating authority. They argue that Rutgers had the economic weapons of terminating the contracts and withholding payments, so that only Rutgers could effectively cause the prime contractors, particularly Briscoe, to keep up to schedule. Though this contention has some surface appeal, it fails to account for the entire contractual structure governing the project. Rutgers' power to terminate a contract or withhold funds did not alter its expressed intent to have someone else supervise the work. Rutgers had delegated that overall responsibility to Briscoe. Rutgers never intervened to coordinate the operations. It never assumed control.

The plaintiffs also claim that Rutgers retained coordination and supervision over the job because of the roles of the Department of New Facilities and critical path method consultant.

These contentions are misconceived. The Department's functions were primarily quality control and only incidentally affected time of performance. The consultant plotted actual progress as against the scheduled performance, but did not supervise and coordinate the work. Nor does the architect's supervisory role support plaintiffs' position. First, the architect's agreement was not incorporated in the contractors' contracts. Second, Rutgers' delegation of coordinating functions to the architect confirms, if anything, that Rutgers itself was not engaged in any such undertaking. Lastly, plaintiffs rely on an indemnity clause in each contract that provided that if a contractor or subcontractor sued Rutgers, the contractor would defend, indemnify and save Rutgers harmless. However, that provision simply confirms the intent that Rutgers was not to be responsible for defaults of other prime contractors, including Briscoe.

When viewed in its entirety, the contractual scheme contemplated that if a contractor were adversely affected by delays, it could maintain an action for costs and expenses against the fellow contractor who was a wrongdoer. Furthermore, a contractor had a right to obtain extensions of time to complete the work when delayed by "any act or neglect" of any other contractor. Other than those remedies, the contractor could not look to Rutgers for recourse because of its failure to coordinate the work.

### III

If Rutgers had breached a supervisory and coordinating duty that led to delay, there would still remain for consideration the scope of the exculpatory clauses in the plaintiff's contracts. Paragraph Seventh in the contract reads:

> SEVENTH: If the Contractor is delayed in completion of the work by any act or neglect of the Owner, Architect, or of any other Contractor employed by the Owner, or by changes ordered in the work, or by strikes, lockouts, fire, unusual delay by common carriers, unavoidable casualties, or any cause beyond the Contractor's control or by any cause which the Architect shall decide to justify the delay, then for all such delays and suspensions the Contractor shall be allowed one day additional to the time limitations herein stated for each and

every day of such delay so caused in the completion of the work, the same to be ascertained solely by the Architect, and a similar allowance of extra time will be made for such other delays as the Architect may find to have been caused by the Owner.

No such extensions of time shall be made for any one or more delays unless within three (3) days after the beginning of such delays a written request for additional time shall be filed with the Architect. In case of a continuing cause of delay, only one request is necessary.

No claim for damages or any claim other than for extensions of time as herein provided shall be made or asserted against the Owner by reason of any of the delays herein mentioned.

Anything contained in the Contract to the contrary notwithstanding the Contractor shall not be entitled to damages or to extra compensation by reason of delays occasioned by proceedings to review the awarding of the Contract to the Contractor or to review the awarding of any other Contract to any other Contractor.[9]

As stated, the provisions concerning these delays referred to circumstances where the contractor was unable to proceed because of any unforeseeable cause beyond its control, including "acts of the Owner" as well as "acts of another Contractor." The General Conditions also stated that the contractor "shall not be entitled to any damages or extra compensation from the Owner on account of any work performed by the Owner or other Contractors, that in any way affects the work under [the] Contract." Further, the General Conditions, after referring to the authority of the Department of New Facilities to stop the work to insure proper execution, provided that stoppage by Rutgers "shall not render it liable for claims of any kind, including delays, either by the affected Contractor or Contractors, or by any other Contractor."

We have previously upheld exculpatory clauses in construction contracts, *Ace Stone, Inc. v. Wayne Township*, 47 *N.J.* 431, 434 (1966), and no party questions their validity in this proceeding. *Gherardi, supra,* summarized the basic principles applicable to no-damage provisions:

---

[9]Provisions similar to the Seventh section appeared in the General Conditions.

> Where a party to a contract containing a "no damage" clause acts within the fair and legal import of its terms, he cannot be deprived of the benefit of his agreement unless, since every contract implies fair dealing between the parties, his conduct indicates bad faith or some other tortious intent. [53 *N.J.Super.* at 365]

*Accord A. Kaplen & Son, Ltd. v. Housing Authority*, 42 *N.J.Super.* 230, 234 (App.Div.1956).

As with any other contract provision, an exculpatory clause has to be interpreted and applied in accordance with recognized principles of contract law. The scope and application of such a provision may depend on particular circumstances. In a given case, factors such as the good faith of the party seeking enforcement, abandonment of the contract, unconscionability and other contract defenses may bear on the enforceability of the exculpatory agreement. *See Gherardi*, 53 *N.J.Super.* at 365; *Kaplen*, 42 *N.J.Super.* at 234.

No-damage provisions are a part of the economic package upon which the parties agree. The contractor who chooses to accept these risks will reflect the accompanying responsibility in his price. In assessing the allocation of risk contained within any such agreement, it is necessary to examine the contractual language in the light of the circumstances to discover the intent of the parties. *See Atlantic Northern Airlines, Inc. v. Schwimmer*, 12 *N.J.* 293, 301 (1953).

Our analysis in this respect is somewhat limited. As previously indicated, we restricted our review to Rutgers' duty to coordinate the activities of the contractors. If there had been a breach of this duty, the loss or damage to the contractors would be that due to any resultant delay. We are satisfied that the sweep of the no-damage clause included these delays.

The plaintiffs have advanced the argument that the exculpatory clause applies only to reasonable delays. Such a construction would subject Rutgers in almost every case to the question of whether the delay was reasonable, thereby rendering the provision meaningless. *See Psaty & Fuhrman, Inc. v. Housing Authority*, 76 *R.I.* 87, 68, *A.2d* 32 (1949). The very

purpose of the clause was to avoid that type of exposure and, though a contractual provision should generally be construed narrowly against the drafter, *Ace Stone, Inc. v. Wayne Township*, 47 *N.J.* at 434, the construction should be sensible and in conformity with the expressed intent of the parties. Moreover, the trial court in reviewing the details concerning Rutgers' alleged failure to act found that it did act reasonably and that it did not actively interfere with the progress of the work. Implicit in these findings is the conclusion that Rutgers did not act in bad faith. We find record support for these conclusions.

The exculpatory provision did contemplate that the prime contractors would be entitled to make claims for extensions of time. The trial court recognized the validity of these claims and held "that Dobson and Broadway are entitled to extensions of time at least equal to what is necessary to offset the claim for liquidated damages" that Rutgers had asserted in its counterclaims. 157 *N.J.Super.* at 420. These counterclaims were based on the provision that if the contractor "shall neglect, fail or refuse to complete the work within the completion time," the contractor was to pay Rutgers for each day "he is in default on time to complete the work" the amount of $200 "as liquidated damages for such breach of contract." This construction of the interplay between the time extension and liquidated damage clauses is sound. The contractor, by demonstrating that it had been granted or was entitled to extensions of time, could defend against the owner's claim for failure to perform on time. In offsetting the one against the other, the trial court acknowledged that the contractor had been entitled to some extensions of time and gave effect to those extensions. In so doing the trial court assumed that the plaintiffs were placed in as good a position as if the extensions had been granted when requested. The plaintiffs counter that the failure to grant the requests promptly caused them to keep unnecessary manpower available. Although this issue is beyond the scope of the certification and need not be discussed, we note that this claim must fall. Plain-

tiffs' proofs never isolated the monetary damages ascribable to this claim, particularly by not showing, as the trial court observed, what other work existed on the project that its "forces did, or could have done, while the delay in one area prevailed."

## IV

In summary then, we hold that a third party beneficiary may sue on a contract when it is an intended and not an incidental beneficiary. Resolution of that issue depends upon examination of the contractual provisions and the attendant circumstances. In a construction project where the owner directly hires the various contractors, the owner may engage a separate contractor to coordinate and supervise the project and agree with the several contractors that the general supervision will be carried out in that manner. Lastly, the owner may exculpate itself from liability for damages to the extent delineated in the contract, in the absence of any public policy reasons to the contrary.

The judgment is affirmed.

*For affirmance* —Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER and O'HERN—5.

*For reversal* —None.