720 A.2d 386

K. WOODMERE ASSOCIATES, L.P. AND KAPLAN AT TOMS RIVER, INC., PLAINTIFFS–APPELLANTS, v. MENK CORPORATION, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 28, 1998—Decided November 12, 1998.

*Ronald S. Blumstein*, argued the cause for appellants (*Scott F. Jamieson* and *Mr. Blumstein*, on the brief).

*Dennis J. Cantoli*, argued the cause for respondent (*Sinn, Fitzsimmons, Cantoli, West & Pardes*, attorneys; *Mr. Cantoli*, on the brief).

The opinion of the court was delivered by

FALL, J.S.C. (temporarily assigned).

In this declaratory judgment appeal, we consider the novel issue of competing claims by present and prior property owners to cash performance bonds posted by the prior owner pursuant to municipal approvals for development of that property. After a non-jury trial, the judge ruled in favor of the current property owner, determining the "as is" quitclaim deeding of title to the property transferred the prior owner's interest in the cash performance bonds to the current property owner. The trial judge ruled that absent agreement and consideration to the contrary, the cash performance bonds "run with the land" and become the property of the grantee. We disagree and reverse.

I.

An understanding of the issues and our ruling requires considerable discussion of the complex factual and procedural history of this matter.

Plaintiff, K. Woodmere Associates, L.P. (Woodmere), owner of real property located in Lakewood Township, Ocean County, obtained municipal approvals for construction of a 375–unit senior citizen life-care community with a 60–bed nursing home, known as Woodmere. Plaintiff, Kaplan at Toms River, Inc. (Kaplan), owner of real property located in Dover Township, Ocean County, obtained municipal approvals for construction of a 399–unit senior citizen townhouse community known as Le Resort. Woodmere and Kaplan have the same principal owners, Michael Kaplan and Morris Kaplan, and are collectively referred to as the "Kaplan Entities."

Incident to these development approvals, the Kaplan Entities posted performance guarantees for both projects, to insure satisfactory installation of various required offsite and onsite improvements. *See N.J.S.A.* 40:55D–53a(1). Performance guarantees were posted both with Lakewood Township and the Lakewood Municipal Utilities Authority (MUA) for the Woodmere development in 1987. The performance guarantees with Lakewood Township were in the form of performance bonds only. The performance guarantees posted with Lakewood MUA were in the form of performance bonds for 90%, and cash bonds for 10% of the estimated cost to install the required offsite sewer and onsite sewer and water utility improvements. The cash bonds posted on the Woodmere project with Lakewood MUA totaled approximately $37,000.

With respect to the Le Resort development, the performance guarantees were posted with Dover Township in the form of performance bonds for 90%, and cash bonds for 10% of the estimated cost of improvements installation. The total cash bonds posted with Dover Township by the Kaplan Entities for this project totaled approximately $70,000. Michael and Morris Kaplan personally indemnified the sureties posting the performance bonds on both projects.

At the time the Kaplan Entities were developing these properties, they had two outstanding loans from Midlantic National Bank (Midlantic). One was a construction loan to Kaplan at Toms River, Inc., and the second was a line of credit to K. Woodmere Associates, L.P. The outstanding principal loans totaled approximately $8 million, and both were personally guaranteed by Michael and Morris Kaplan. These loans were also guaranteed and secured as part of a cross-collateralization by two other properties owned by affiliates of the Kaplan Entities, one in Lakewood Township and the other in Jackson Township.

The developments proceeded, and many of the required improvements were installed on both projects. However, being over-extended, and unable to meet their obligations, Michael and

Morris Kaplan filed for protection under Chapter 11 of the Bankruptcy Code, individually and on behalf of the various Kaplan Entities, on February 11, 1991. In a Chapter 11 proceeding, the debtor remains in possession of its assets and continues to operate its business, rather than undergoing a distribution of assets through liquidation, as in a Chapter 7 proceeding. *See* 11 *U.S.C.A* § 1107(a). The debtor files a plan of reorganization, a committee of unsecured creditors is appointed by the court, and the reorganization plan is subject to approval of the Bankruptcy Court. A trustee is not routinely appointed. Once approved, the debtor continues in possession and continues to operate its business in accordance with the plan, periodically reporting to the United State Trustee. *See* 11 *U.S.C.A.* § 1102(a)(1), § 1102(b)(1), § 1107(a), § 1106(a)(1), and § 1125(b). Here, the committee of unsecured creditors was appointed on March 1, 1991. The creditors committee approved, and the Bankruptcy Court confirmed, the five-year plan of reorganization in January 1993. The reorganization plan was implemented and is now complete. The uncontroverted evidence before the trial court established the cash performance bonds were part of the cash assets listed on the required Debtors' Disclosure Statement. *See* 11 *U.S.C.A.* § 1125(b).

In June 1991, the Kaplans and Midlantic entered into settlement negotiations in an attempt to resolve the outstanding $8 million obligation. They reached an agreement in August 1991, having two principal components. First, the Kaplan Entities agreed to transfer ownership of the Woodmere and Le Resort properties to Midlantic by quitclaim deed in "as-is" condition. In return, Midlantic would deem $7.5 million of the debt satisfied and discharged. Second, $500,000 would remain as a non-recourse obligation of the Kaplan Entities, secured by the same Lakewood Township and Jackson Township properties that secured and cross-collateralized the original loans. The agreement was memorialized by correspondence.

In October 1991, the Kaplans filed a verified application with the United State Bankruptcy Court for the District of New Jersey seeking approval of the Midlantic agreement. The unsecured creditors committee and the Bankruptcy Court approved the agreement on February 24, 1992. According to the testimony of Michael Kaplan, a critical part of the consideration for the Kaplans and the creditors committee was conveyance of the Woodmere and Le Resort properties to Midlantic be "as is", without any requirement the Kaplan Entities continue or complete any construction at either site. A formal contract between the Kaplan Entities and Midlantic for transfer of the properties was never prepared. The Kaplan Entities executed quitclaim deeds to Midlantic for the Woodmere and Le Resort properties on June 26, 1992.

There is no reference to the cash performance bonds in any of the deeds, documents, or correspondence between the Kaplan Entities and Midlantic. There is no evidence the cash originally posted by the Kaplan Entities with Lakewood MUA or Dover Township to secure performance of the project improvements formed any part of the consideration for the agreement with Midlantic transferring ownership of the Woodmere and Le Resort properties.

On January 5, 1994 Midlantic entered into a written agreement to sell the Le Resort and Woodmere to Hovsons, Inc. Under the agreement, Hovsons, Inc. acknowledges it is purchasing the properties in "as-is" condition. Correspondence from Hovsons, Inc. to Midlantic, Inc. dated December 6, 1993 states Hovsons, Inc. sought the right to receive all cash performance bonds posted on the Le Resort project, when released. Apparently, neither Midlantic nor Hovsons, Inc. were aware until later that there were cash performance bonds on the Woodmere project. Paragraph 10.1(g) of the January 5, 1994 agreement contains the following language:

> Seller shall assign by a Quit Claim Assignment to Purchaser any rights, title or interest that Seller has or may have to any bonds and any fees previously paid and held by Dover Township. Notwithstanding such assignment, Seller makes no representation or warranty as to Seller's rights to any such bonds and Purchaser

shall, as part of Purchaser's due diligence investigation, be responsible for investigating and satisfying itself as to the bonding requirements and rights related to same.

Hovsons, Inc. assigned its rights under the agreement with Midlantic to Athena Portfolio Investors L.P., which took title to both properties on April 22, 1994. Athena Portfolio Investors L.P. then transferred the properties to defendant, Menk Corporation, by deeds dated May 17, 1994. In the quitclaim and assignment of rights by Athena Portfolio Investors L.P. to Menk Corporation incident to that transfer, reference is made to both the Lakewood MUA and Dover Township cash performance bonds.

## II.

Dover Township and Lakewood MUA are faced with the competing claims of these parties for return of the cash performance bonds posted by the Kaplan Entities on the Woodmere and Le Resort projects. In ruling that upon release by Dover Township and Lakewood MUA defendant, Menk Corporation, is entitled to return of the cash performance bonds, the trial judge stated:

Menk argues that Midlantic could not have intended Woodmere or Kaplan at Toms River to retain these performance guarantees since the bank was in effect discharging them from a $7 and a half million debt. Whatever Midlantic agreed with Hovsons or later Athena about the performance guarantees, they could only give whatever rights they may have had themselves.

This Court believes that what matters here is the purpose of the performance guarantees. There is statutory requirement for land development. Land developers must put up cash and bonds to ensure their performance with regard to certain improvements, and I cite *R.S.* 40:55D–53 as amended. There is an´ exception according to Michael Kaplan if the performance is begun and completed before approvals are sought; however, in this case both Lakewood MUA and Dover Township required bonds and cash which were put up by the two corporations or two entities.

In this situation this Court has no doubt that the plaintiffs or defendant would complete the work as required by the township according to Mr. Kaplan's testimony and also the representation of Mr. Yegparian's counsel or the counsel for Menk; however, this Court finds that the interest of the rate payers of the MUA and the taxpayers of Dover Township to be paramount. A municipality or municipal corporation experiencing as it has over the past several years the financial debacle caused by the collapse of many land developers cannot be expected and should not be concerned with bankruptcy arrangements between banks and developer debtors.

> The municipality, Dover Township, and the Lakewood MUA have to make certain that the present owner of the land has lived up to its obligation under the performance bonds and the performance guarantees.
>
> Mr. Kaplan was careful in this instance to require the plaintiffs to convey their land, quote, as is. If there was a hole in the street, if there was improper drainage, if there was improper landscaping, Midlantic had no recourse against Kaplan at Toms River and Woodmere, and Midlantic would have had to complete the work or lose the performance guarantees.
>
> Absent any case or statutory requirement this Court finds that the performance guarantees should follow the land and they are declared to be, subject to the requirements of the Lakewood MUA and the Township of Dover, the property of the Menk Corporation.

On appeal, plaintiffs make these contentions: (1) the record demonstrates they did not assign or otherwise transfer their ownership in the cash bonds to Midlantic; (2) the "as is" conveyance of the properties does not evidence an intent by plaintiffs to transfer ownership in the cash bonds; and (3) it was not necessary to rule in favor of defendant to protect the interests of Dover Township and the Lakewood MUA, as such protection is adequately provided by statute.

### III.

Defendant asserts that when the Kaplan Entities deeded their interests in the Woodmere and Le Resort properties, they expressly or implicitly relinquished their claims to the cash performance bond monies. We disagree. A valid assignment must contain evidence of the intent to transfer one's rights, and "the subject matter of the assignment must be described sufficiently to make it capable of being readily identified." 3 *Williston, Contracts* (3 ed. Jaeger 1957) Section 404 at 4; *Transcon Lines v. Lipo Chem., Inc.*, 193 *N.J.Super.* 456, 474 A.2d 1108 (Cty.Dist.Ct. 1983).

Here, an examination of the negotiations between Midlantic and the Kaplan Entities reveals no mention of the cash performance bond monies. There is no reference to the performance bonds or posted cash in either the settlement agreement approved by the Bankruptcy Court, the letters exchanged between the parties in

the course of their negotiations, or in the deeds transferring the properties to Midlantic. Indeed, the uncontroverted testimony showed these cash bond monies were included within the cash assets disclosed in the Chapter 11 proceeding, and were part of the bankruptcy estate. The inference is that approval of the settlement agreement between the Kaplan Entities and Midlantic by the unsecured creditors committee and the Bankruptcy Court was with the knowledge that the cash performance bond monies were not part of that agreement and would remain in place to assist in execution of the reorganization plan.

■ Cash bonds are property of the bankrupt's estate. *See Kennedy v. Powell*, 366 *F.*2d 346, 348 (9th Cir.1966). Representatives from both plaintiffs and defendant testified that the regular course of practice when a successor developer takes over a project is for the new developer to post their own performance guarantees, with the original performance guarantees returned to the original developer. There is no evidence of an intent by plaintiffs to transfer their rights or ownership of the cash performance bonds to Midlantic. Further, the record supports the conclusion that Midlantic did not even consider the existence of cash performance bonds until they were brought to its attention, as to the Le Resort development, by the December 6, 1993 letter from Hovsons, Inc. The unusual manner in which these transactions evolved largely accounts for the absence of negotiations, and agreement, concerning the cash performance bond monies. From the trial testimony, we conclude the issue would have been dealt with if plaintiffs and defendant had directly negotiated the transfer of the properties. It appears the intervening presence of Midlantic in the transactions allowed that issue to be omitted. Certainly, Midlantic could only transfer to Hovsons, Inc. or Athena Portfolio Investors L.P., and Athena to Menk Corporation, that which it obtained from the Kaplan Entities.

■ Contract interpretation must be based on the intent of the parties. *Ace Stone Inc. v. Wayne Township*, 47 *N.J.* 431, 439, 221 *A.*2d 515 (1966); *Tessmar v. Grosner*, 23 *N.J.* 193, 201, 128

A.2d 467 (1957). In determining that intent, the court must consider many factors, including the document itself and the surrounding circumstances. *Broadway Maintenance Corp. v. Rutgers,* 90 *N.J.* 253, 447 *A.*2d 906 (1982). Here, examination of the documents and the surrounding circumstances fail to reveal any evidence of an intent to transfer the cash performance bonds to Midlantic. Without some evidence of an intent to transfer the cash performance bonds, defendant's claim is without merit.

■ The properties were transferred to Midlantic by quitclaim deed. A quitclaim deed contains no warranties of either title or land. Essentially, a quitclaim deed transfers "whatever interests I have, assuming I have any" in the title. It is construed as a deed without covenants. *See* Powell, *Real Property* § 81A–29 at 897 (1990); Celentano, *New Jersey Practice,* v.13, § 17.14 at 384 (1998). This transfer of property between the Kaplan Entities and Midlantic can hardly have transferred with it any interest beyond the language of the deed itself. It transferred whatever interest the Kaplan Entities had to the title, or ownership, of the real property and any improvements. Cash performance bonds posted with municipal entities are not encompassed within that transfer.

■ Defendant asserts inclusion of the "as is" language by plaintiffs in the agreement with Midlantic evidences an intent to disclaim all rights and interests associated with the land, including the cash performance bonds. Defendant relies on definitions of "as is" provided by the U.C.C. relating to exclusion of implied warranties, *N.J.S.A.* 12A:2–316(3)(a); however, this definition provides little guidance, since here the language was used in association with the transfer of title to real property, and not the sale of goods. *See N.J.S.A.* 12A:2–105.

■ When used in connection with the sale of real property, "as is" generally means the purchaser is acquiring real property in its present state or condition. *Olmsted v. Mulder,* 72 *Wash.App.* 169, 863 *P.*2d 1355, 1358 (1993), *cert. denied,* 123 *Wash.*2d 1025,

875 *P.*2d 635 (1994). The term implies real property is taken with whatever faults it may possess, and that the grantor is released of any obligation to reimburse purchaser for losses or damages resulting from the condition of the property conveyed. *Ibid. See Coolidge & Sickler, Inc. v. Regn.,* 7 *N.J.* 93, 80 *A.*2d 554 (1951). This definition is consistent with Michael Kaplan's testimony of his understanding of the use and inclusion of the term "as is" in plaintiffs' agreement with Midlantic. Kaplan testified this language was important to the Kaplan Entities and to the bankruptcy creditors committee because they did not want to be liable on the residential warranties for any of the improvements already constructed on the projects. Plaintiffs did not intend to transfer their ownership rights to the cash performance bonds by the "as is" terminology.

Defendant also maintains plaintiffs transferred their interest in the cash bonds to Midlantic through application of the doctrine of equitable assignment. An equitable assignment is an assignment unenforceable in a court of law, but which a court of equity will recognize and imply from the circumstances and because of the equities involved. It is recognized solely because the assignee is a purchaser for value. *Sheeran v. Sitren,* 168 *N.J.Super.* 402, 413, 403 *A.*2d 53 (Law Div.1979). No particular form is necessary, yet a number of essential elements have been recognized. The intention of the assignor must be to transfer a present interest in an existing fund or subject matter; there must be an absolute appropriation of the fund or subject matter by the assignor and an intention to vest a present right in the assignee; the assignor must relinquish all control over the fund; if any control is retained, an assignment will be invalid; and the assignment must be based on valuable consideration. *Sheeran,* 168 *N.J.Super.* at 413–14, 403 *A.*2d 53. Whether a transaction constitutes an equitable assignment is to be decided from the circumstances and equities involved. *Ibid.* Here, it is clear from the record and foregoing discussion that plaintiffs did not intend to vest any rights in the cash performance bonds in Midlantic, nor

did plaintiffs relinquish control over the funds. All the evidence and reasonable inferences indicate just the opposite. The remedy of equitable assignment cannot be used to support defendant's claim.

Performance guarantees are intended to ensure there will be sufficient funds to complete all necessary improvements in a development. Cox, *New Jersey Zoning and Land Use Administration*, § 24–7 at 448 (1998); *N.J.S.A.* 40:55D–53. The cash performance bonds will be released only when the improvements secured by the bonds have been satisfactorily completed. *N.J.S.A.* 40:55D–53(c)(1). If those improvements are not satisfactorily completed, the municipality is entitled to use the bond monies to secure performance by another contractor. *N.J.S.A.* 4:55D–53(c). The municipal entities cannot be harmed by a determination that plaintiffs are entitled to return of the cash bonds upon satisfactory completion of the improvements. The municipal entities are protected to the extent of the bonds, regardless of bond ownership. The concern of the trial court that the rate payors and taxpayers be protected is a legitimate one, but is irrelevant to the issue of cash bond ownership. The statutory protective scheme is applicable equally to both parties. When the required improvements have been completed to the satisfaction of Dover Township and the Lakewood MUA, any refunding of the cash performance bonds is to plaintiffs.

Reversed.