**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| BCD ASSOCIATES, LLC, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. N15C-11-062 EMD |
| | ) | |
| CROWN BANK, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |
| | ) | |
| | ) | |

**DECISION AFTER TRIAL**

Edward Seglias, Esq., Emily Letcher, Esq., Cohen, Seglias, Pallas, Greenhall & Furman, P.C., Wilmington, Delaware, Mary Catherine Emert, Esq., Cohen, Seglias, Pallas, Greenhall & Furman, P.C., Philadelphia, Pennsylvania. *Attorneys for Plaintiff/Counterclaim Defendant BCD Associates, LLC.*

Chad J. Toms, Esq., M. Thomas Wallace, Esq., Whiteford, Taylor & Preston, LLC, Wilmington, Delaware. *Attorneys for Crown Bank.*

## I.     INTRODUCTION

This is a commercial civil action. The action arises out of a $12,988,000.00 construction loan agreement (the "Loan Agreement") by and between Crown Bank ("Crown") and MRPC Christiana, LLC ("MRPC"). MRPC obtained the loan to renovate a hotel located at 56 South Old Baltimore Pike, Parcel Numbers 09-035.00-019 and 09-035.00-12, Newark, Delaware (the "Hotel" or the "Project"). MRPC and Plaintiff BCD Associates ("BCD") entered into a construction agreement (the "AIA Contract"). Under the AIA Contract, BCD would provide the construction services for the renovation of the Hotel.

During construction, BCD would submit invoices for goods and services provided under the AIA Contract. Prior to payment, Crown would review and okay the invoices for payment. Crown would only pay ninety percent of the amount owed and hold back the remaining ten

percent (the "Retainage"). BCD was to be paid the Retainage at the completion of the AIA Contract.

BCD completed the Hotel. The Hotel obtained a temporary certificate of occupancy and a certificate of occupancy. The Hotel became a fully operational hotel after completion. BCD never received payment on its final invoice or the Retainage. This lawsuit relates to the Retainage and the final payment owed BCD. This is the second of a series of lawsuits arising out of the Loan and the Hotel. Earlier, the Court presided over a bench trial between MRPC and Crown over the Loan (the "Loan Trial"). The Court held in favor of Crown and issued a "Decision After Trial."[1]

The Court does not find this to be a close case. Crown owes BCD $1,083,677.91 for unpaid Retainage and for work done by BCD to complete the Hotel. For the reasons set forth below, the Court enters judgment in favor of BCD and against Crown in that amount plus appropriate interests and costs.

Crown Bank agreed to lend MRPC an amount equal to $12,988,000.00. This amount was to allow, in part, for the renovation of the Hotel by BCD. During the process, BCD was to be paid for work completed. BCD would complete work and submit a draw request (the "Draw Request") for the work done. Exercising a payment option under the Loan Agreement, Crown would pay BCD 90% of the approved Draw Request and retain 10% (*i.e.*, the Retainage) to be paid upon completion of the Hotel. To be clear, the Retainage constitutes valid work done and

---

[1] *MRPC Christiana LLC v. Crown Bank*, 2017 WL 6606587 (Del. Super. Dec. 26, 2017). BCD and Crown Bank relied, in part, on evidence admitted in the Loan Trial. This made sense given the interrelatedness of this civil action and the Loan Trial and the doctrine of collateral estoppel which applies to Crown Bank. *See, e.g., Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214 (Del. 1991) (collateral estoppel bars a party from relitigating issues previously litigated); *Tyndall v. Tyndall*, 236 A.2d 343, 346 (Del. 1968) ("Under…[this] doctrine, where a question of fact essential to the judgment is litigated and determined by a valid and final judgment, the determination is conclusive between the same parties in a subsequent case on a different cause of action. In such situation, a party is estopped from relitigating the issue again in the subsequent case."). Delaware does not require mutuality when applying the doctrine of collateral estoppel. *See Columbia Cas. Co.*, 584 A.2d at 1217.

approved (by MRPC and/or Crown) and withheld by Crown until completion. In addition, BCD agreed to complete the Hotel and obtain the certificates of occupancy in exchange for a final payment. MRPC and Crown agreed to this arrangement. The evidence is clear that no one ever paid BCD the Retainage or BCD's final payment. Crown retained the Retainage and did not make the final payment to BCD.

Whether the recovery is through a breach of contract claim, a promissory estoppel claim or a claim for unjust enrichment, the Court finds in favor or BCD. BCD completed its work under the AIA Contract. BCD provided a fully refurbished and operational Hotel. MRPC and Crown benefitted from BCD's work on the Hotel. Crown did not pay outstanding amounts due BCD yet includes these amounts in its claims against MRPC. Crown cannot reap the benefit of the Hotel (obtained through various contractual remedies), include the same amount in its claim against MRPC, and not make BCD whole.

## II.    PROCEDURAL BACKGROUND

BCD initiated this civil action with the filing of a complaint on November 6, 2015.[2] On December 17, 2015, Crown filed an answer.[3] BCD subsequently moved to amend the complaint.[4] Crown opposed the motion to amend.[5] After a hearing on June 25, 2018, the Court granted the motion to amend.[6] Crown answered the Amended Complaint on July 12, 2018.[7] In addition filing an answer, Crown asserted counterclaims.[8]

---

[2] D.I. No. 1.
[3] D.I. No. 4.
[4] D.I. No. 10.
[5] D.I. No. 12.
[6] D.I. No. 13.
[7] D.I. No. 16.
[8] D.I. No. 16.

3

BCD moved to dismiss Crown's counterclaims on July 31, 2018.[9]  Crown opposed the

motion to dismiss.[10]  The Court granted in part and denied in part the motion to dismiss.[11]  The

Court allowed Crown leave to file amended counterclaims.[12]  Crown filed amended

counterclaims on November 26, 2018.[13]  BCD answered the counterclaims on January 17,

2019.[14]

In the Amended Complaint, BCD asserted four claims.  The claims are: (i) Breach of

Contract ("Count I"); (ii) Unjust Enrichment ("Count II"); (iii) Promissory Estoppel ("Count

III"); and (iv) Misrepresentation ("Count IV").  Crown Bank asserted two counterclaims: (i)

Fraud ("Counterclaim I") and (ii) Civil Conspiracy ("Counterclaim Count II").

### III.    THE TRIAL

The Court held a bench trial on BCD's claims and Crown's counterclaims from August

16 through August 18, 2021 (collectively, the "Trial").[15]  The Court then had both parties submit

their closing arguments in written form, receiving the final post-trial paper on or about December

6, 2021.

### A.  WITNESSES

During the Trial, the Court heard from and considered testimony from the following

witnesses:

Thomas Deignan

Chirag P. Patel

Jacinto Rodrigues

---

[9] D.I. No. 18.
[10] D.I. No. 21.
[11] D.I. No. 25.
[12] D.I. No. 25.
[13] D.I. No. 28.
[14] D.I. No. 37.
[15] Super. Ct. R. Civ. P. 39(b)

4

Keith Madigan, P.E.

All the witnesses testified on direct and were available for cross-examination. The fact witnesses in this civil action were Mr. C. Patel, Mr. Deignan, and Mr. Rodrigues. The expert witness was Mr. Madigan.

Normally, the Court would list the witnesses in the order they testified and which party called the witness; however, because the Trial was a bench trial, the Court took witnesses out of order and used Rule 611 of the Delaware Rules of Evidence to allow for examination of the witness for both parties cases-in-chief.

## B. EXHIBITS

The parties submitted an extensive number of exhibits. Most of these exhibits were admitted without objection. The parties provided the Court with the exhibits in the form of joint exhibits ("JX"). The parties agreed that any joint trial exhibit identified in the Loan Trial (JX1—JX797) would be available for use in the Trial. Newly introduced trial exhibits would begin at JX800.[16]

## IV. APPLICABLE LAW

The Court will be applying the following general legal principles:

## A. GOVERNING SUBSTANTIVE LAW

In the Loan Trial, MRPC and Crown relied upon New Jersey law as the Loan Agreement designated that New Jersey law applies to the substantive issues relating to governance, construction and interpretation.[17] In this civil action, BCD and Crown use New Jersey Delaware authorities when addressing the applicable law. The Court will use New Jersey law with respect

---

[16] Joint Pretrial Stipulation and Order at 16-17. D.I. No. 96.
[17] JX84 at Art. 8, sec. 8.1(h) ("This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New Jersey.").

to claims related to the Loan Commitment and the Loan Agreement. The Court is not aware that New Jersey and Delaware law conflicts on the other issues raised in the Trial. Accordingly, the Court will use Delaware law as the governing substantive law on all other claims.

### B. STANDARD OF LAW FOR BREACH OF CONTRACT

In New Jersey, a party must allege three elements to state a breach of contract claim: "(1) a valid contract, (2) breach of that contract, and (3) damages resulting from that breach."[18] If the terms of a contract are clear, "it is the function of a court to enforce it as written and not to make a better contract for either of the parties."[19] Absent ambiguity, the intention of the parties is to be ascertained by the language of the contract.[20] If the language is plain and capable of legal construction, the language alone must determine the agreement's force and effect.[21]

One of the elements that the party must prove is the other party's breach of the contract.[22] Failure to perform a contract in accordance with its terms and conditions constitutes a breach of contract. It does not matter if the failure to perform was purposeful or inadvertent.

Under New Jersey law, a third-party beneficiary is a person or entity that "the contracting parties intended . . . should receive a benefit which might be enforced in the courts."[23] New Jersey law recognizes that parties to a contract can be liable to third-parties. New Jersey Statutory law provides that "a person for whose benefit a contract is made may sue on the contract in any court."[24] New Jersey courts have stated that the statutory law merely restates

---

[18] *EnviroFinance Group, LLC v. Environmental Barrier Co., LLC*, 113 A.3d 775, 787 (N.J. Super. App. Div. 2015).
[19] *Kampf v. Franklin Life Ins. Co.*, 161 A.2d 717, 720-21 (N.J. 1960).
[20] *Dontzin v. Myer*, 694 A.2d 264, 267 (N.J. Super. App. Div. 1997).
[21] *Royal Ins. Co. v. Rutgers Casualty Ins. Co.*, 638 A.2d 924, 927 (N.J. Super. App. Div. 1994).
[22] Taken from New Jersey Model Jury Charge (Civil) 4.10 "Bilateral Contracts" (May 1998); New Jersey Model Jury Charge (Civil) 4.10 L "Claims of Breach" (May 1998).
[23] *Broadway Maint. Corp. v. Rutgers, State Univ.*, 447 A.2d 906, 909 (N.J. 1982) (citations omitted).
[24] N.J. Stat. Ann. § 2A:15-2.

established New Jersey law that third-party beneficiaries may sue upon a contract made for their benefit without "privity of contract."[25]

## C. GENERAL DAMAGES – BREACH OF CONTRACT[26]

A plaintiff who is awarded a verdict for breach of contract is entitled to compensatory damages for such losses as may fairly be considered to have arisen naturally from the defendant's breach of contract. Alternatively, a party may be entitled to such damages as may reasonably be supposed to have been contemplated by both parties, at the time they made the contract, as the probable result of the breach of such contract.

Compensatory damages for breach of contract are designed under the law to place the injured party in as good a monetary position as he/she would have enjoyed if the contract had been performed as promised. What that position is depends upon what the parties reasonably expected at the time they made the contract. A party is not liable for a loss that the parties did not have reason to foresee as a probable result of any breach. While the loss must be a reasonably certain consequence of the breach, the exact amount of the loss need not be certain.

## D. UNJUST ENRICHMENT

The elements of unjust enrichment are: (i) an enrichment, (ii) an impoverishment, (iii) a relation between the enrichment and impoverishment, (iv) the absence of justification, and (v) the absence of a remedy provided by law.[27]

---

[25] *Rieder Communities, Inc. v. Twp. of N. Brunswick*, 546 A.2d 563, 566-67 (N.J. App. Div. 1988) (citations omitted).

[26] Taken from New Jersey Modern Jury Charge (Civil) 8.45 (December 2014); *see also Donovan v. Bachstadt,* 453 A.2d 160 (N.J. 1982); *525 Main Street Corp. v. Eagle Roofing Co.*, 168 A.2d 33 (N.J. 1961); *Coyle v. Englander's,* 488 A.2d 1083 (N.J. Super. App. Div. 1985).

[27] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010); *see also Galvagna v. Marty Miller Constr., Inc.* 1997 WL 720463, at *3–4 (Del. Super. Sept. 19, 1997) (stating that an owner is unjustly enriched when a subcontractor has provided labor and materials to an owner but has not been paid by the general contractor).

### E.  PROMISSORY ESTOPPEL

Under Delaware law, the four elements of promissory estoppel are: (i) a promise was made: (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise.[28]

"Promissory estoppel is used to penalize a person who has intentionally and improperly induced action on the part of another to their detriment. But, its fundamental purpose is the prevention of injustice."[29]  Promissory estoppel operates to create a binding promise where the promisor has made a promise that it reasonable expects to induce action on the part of the promisee, and which does induce such action and "injustice can be avoided only by enforcement of the promise."[30]

### F.  MISREPRESENTATION

Under Delaware law, a party must satisfy five elements to prove misrepresentation.  The plaintiff must prove: (i) the existence of a false representation, usually one of fact, made by the defendant; (ii) that the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (iii) that the defendant had the intent to induce the plaintiff to act or refrain from acting; (iv) that the plaintiff acted or did not act in justifiable reliance on the representation; and (v) that the party suffered damages as a result of such reliance.[31]

---

[28] *Chrysler Corp. (Delaware) v. Chaplake Holdings, Ltd.*, 822 A.2d 1024, 1032 (Del. 2003).
[29] *See Chrysler Corp. v. Quimby*, 144 A.2d 123, 133, *adhered to on reh'g*, 144 A.2d 885 (1958).
[30] RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981).
[31] *Lee v. Linmere Homes, Inc*., 2008 WL 4444552, at *5 (Del. Super. Oct. 1, 2008) (internal citations omitted).

A defendant's representation does not need to be overt. A defendant's deliberate concealment of a material fact or silence in the face of a duty to speak is sufficient for a claim of intentional misrepresentation.[32] Where a party makes a promise with no intention of performing the promise, there is a valid claim for misrepresentation.[33]

### G. FRAUD

To recovery on a claim for fraud in Delaware, a party must show: (i) that the defendant made a false representation; (ii) the defendant know or believed the representation was false or was made with reckless indifference to the truth; (iii) the defendant intended to induce the party to act or refrain from acting; (iv) the party's action or inaction was taken in justifiable reliance upon the false representation; and (v) the party suffered resultant damages.[34]

### H. CIVIL CONSPIRACY

Under Delaware law, the elements required to demonstrate the existence of a civil conspiracy are: (i) a combination of two or more persons; (ii) an unlawful act in furtherance of the conspiracy; and (ii) actual damages.[35] A claim for civil conspiracy is not an independent cause of action and must instead arise from an underlying wrong.[36]

Where the underlying wrong for a civil conspiracy is fraud, that fraud must be proven with particularity.[37]

---

[32] *Id.*

[33] *Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009).

[34] *Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008).

[35] *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1288–89 (Del. Super. 2001).

[36] *Id.*; *see also Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998) (holding that where a complaint fails to state a claim as to an underlying tort, a civil conspiracy claim must be dismissed); *Outdoor Techs., Inc. v. Allfirst Fin., Inc.*, 2001 WL 541472, at *6 (Del. Super. Apr. 12, 2001) (granting summary judgment on fraud and civil conspiracy claims stating that where a fraud claim is not viable as a matter of law, the accompanying civil conspiracy claim must also fail as there is no independent tort to sustain it).

[37] *See Abbott Labs. v. Owens*, 2014 WL 8407613, at *11 (Del. Super. Sept. 15, 2014) (dismissing plaintiffs' claim for civil conspiracy because they had not pled fraud with the requisite particularity).

## I.  BURDEN OF PROOF BY A PREPONDERANCE OF THE EVIDENCE[38]

In a civil case, the burden of proof is by a preponderance of the evidence.  Proof by a preponderance of the evidence means proof that something is more likely than not.  It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes the Court believe that something is more likely true than not.  Preponderance of the evidence does not depend on the number of witnesses.  If the evidence on any particular point is evenly balanced, the party having the burden of proof has not proved that point by a preponderance of the evidence, and the Court must find against the party on that point.  In deciding whether any fact has been proved by a preponderance of the evidence, the Court may consider the testimony of all witnesses regardless of who called them, and all exhibits received into evidence regardless of who produced them.

In this case: (i) BCD must prove all the elements of Counts I through IV by a preponderance of the evidence; and (ii) Crown must prove all the elements of the two Counterclaims by a preponderance of the evidence.[39]

## J.  EXPERT TESTIMONY[40]

Crown presented expert testimony during the Trial.  In weighing expert testimony, the Court may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors previously mentioned for weighing the testimony of any other witness.  Expert testimony should receive whatever weight and credit the Court thinks appropriate, given all the other evidence in the case.

---

[38] Taken from Superior Court Civil Pattern Jury Instruction 4.1.
[39] *See, e.g., Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967)(defining preponderance of the evidence); *Oberly v. Howard Hughes Medical Inst.*, 472 A.2d 366, 390 (Del. Ch. 1984)(same).
[40] Taken from Superior Court Civil Pattern Jury Instruction 23.10.

The expert witness was Mr. Madigan. Crown offered Mr. Madigan's expert testimony to support Counterclaim I and Counterclaim II. According to Crown, Mr. Madigan is a professional engineer with over 30 years of engineering and commercial construction management experience. Mr. Madigan prepared a report dated January 12, 2020 (the "Report"). The Report provides five conclusions: (i) BCD entered into a construction contract with MRPC "with knowledge" that the fixed price contract amount was inadequate to see the Project through to completion; (ii) BCD and MRPC worked together to conceal change order costs from Crown; (iii) BCD submitted pay applications for completed work to MRPC and Crown that were misleading: (iv) BCD incurred less than $50,000 of additional project costs after an onsite meeting on December 21, 2014; and (v) BCD failed to manage the Project competently which resulted in excessive cost and schedule overruns.

Overall, the Court found Mr. Madigan to be credible but not helpful as to the issues presented to the Court. Mr. Madigan's testimony was conclusory and did not account for prior testimony in the Loan Trial relating to the Hotel or BCD's performance. The Court was left to wonder why Anthony Mirandi (discussed below) or the independent architect and their roles were not factored into the conclusions. Moreover, Crown was involved during negotiations over the various loan modifications, in reviewing and approving the Draw Requests and work completion. Additionally, although allocation changed, Crown never lent more than the original Loan amount ($12,988,000.00). In addition, the reality is that the Hotel was completed, completed to the satisfaction of all including, among others, the franchisor and the independent architect, and began functioning as a fully operational hotel once the Certificate of Occupancy was obtained. To the Court, Mr. Madigan stretched too few facts to come to his conclusions.

11

## V.    DISCUSSION

The Court heard from several witnesses—both fact and expert.  Before detailing the findings of fact and conclusions of law, the Court is going to address the credibility and effectiveness of the witnesses.

### A. CREDIBILITY OF WITNESSES

Here, the Court is the sole judge of each witness's credibility, including the parties.[41] That includes the parties.  The Court considers each witness' means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witnesses' biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

The Court finds that—based on their testimony at the Trial, their manner or demeanor on the witness stand, and all circumstances that, according to the evidence, could affect the credibility of the testimony—Mr. Deignan and Mr. Patel were very credible witnesses.  The Court also finds that Mr. Deignan and Mr. Patel provided testimony that was helpful to the Court on the issues to be decided in this civil action.

The Court did not find the testimony of Mr. Rodrigues to be overly credible or helpful.  In fact, the Court felt that Mr. Rodrigues was not entirely forthcoming or truthful, especially as to events that happened in December 2014.  Moreover, some of the testimony of Mr. Rodrigues seemed contrary to the evidence adduced at the Trial and the plain language of controlling documents.  Mr. Rodrigues' testimony surrounding the completion of the Project and promises of payment were directly contradicted by credible testimony, testimony from a prior trial and the

---

[41] Taken from Superior Court Civil Pattern Jury Instruction 23.9.

exhibits introduced in this trial. Mr. Rodrigues was Crown's representative at the Trial. As such, Mr. Rodrigues had a strong interest in the outcome of this civil action, *i.e.*, bias. This showed through unreasonable testimony, inconsistency of testimony, convenient memory failure and his demeanor on the stand.

### B. FINDINGS OF FACT

#### 1. The Parties

Crown is a New Jersey chartered bank. Crown's principal place of business is located at 27 Prince Street, Elizabeth Union County, New Jersey, 07276.[42]

BCD is a joint venture between Bancroft Construction Company ("Bancroft") and Carrollton Design Build ("Carrollton").[43] Bancroft is an established Delaware general contracting firm with over 20 years of construction experience.[44] Before the Project, Carrollton had built "dozens of comparable hotels" involving third-party lenders.[45]

#### 2. The Hotel and Decision to Renovate and Reflag

In 2011, MRPC closed the Hotel so that it could be renovated and reflagged.[46] At about the same time, MRPC, engaged DelVal Financial Business Corp. ("DelVal") for the purpose of originating, underwriting, processing, and servicing the SBA component of the financing needed for rebranding and renovating the Property.[47]

MRPC sought out a lending source for the additional financing needed to complete the Project. In or around early March of 2012, a financing agent, CLC Lending, introduced MRPC

---

[42] JX84.
[43] *MRPC Christiana LLC*, 2017 WL 6606587, at *23.
[44] *Id.*; JX774.
[45] *MRPC Christiana LLC*, 2017 WL 6606587, at *23.
[46] *Id.* at *9; JX 779 at 3.
[47] *MRPC Christiana LLC*, 2017 WL 6606587, at *9.

to Crown.[48]  The parties entered into a Letter of Intent on or about March 5, 2012, which required that MRPC pay Crown a fee of approximately $20,000.[49]

### 3. The Loan Documents

This civil action is not about the loan between MRPC and Crown.  However, BCD makes a claim for final payment and the Retainage.  Crown and MRPC discussed the issue of payment and retainage in the early stages of their financial discussions—*i.e.*, in the initial loan commitment.  As such, the Court must necessarily discuss the underlying loan documents and their relevant terms and conditions.

### a. The Loan Commitment

MRPC and Crown entered into a loan commitment letter dated May 31, 2012 (the "Loan Commitment"), outlining the terms and conditions of Crown's commitment to lend nearly $13 million to MRPC through a construction loan and a bridge loan.[50]  Senior Vice President and SBA Director, Larry Kneip, signed the Loan Commitment for Crown, and Mr. Patel signed the document for MRPC.[51]

The Loan Commitment, among other things, provides:

- the term of the Loan was to be 12 months from closing;

- a list of "Collateral Security;"

- an entity entitled Tetra Tec was to provide a performance Bond, complete a plan and cost review to determine acceptability prior to closing and conduct site inspections and review all draw requests.  Crown was to review and approve the plan and cost review prior to closing;

- Crown Bank would not make the Loan with the SBA 504 Lender issuing a commitment to refinance the Bridge Loan.[52]

---

[48] *Id.*
[49] *Id.*; JX785.
[50] JX800.  In the Loan Trial, the Loan Commitment was JX23.
[51] JX800.
[52] JX800 at 2-6.

14

Exhibit A to the Loan Commitment provides for the use of the Loan proceeds (the "Sources and Uses"). The Sources and Uses were reviewed and approved by Crown, MRPC and DelVal before the Loan closed.[53] Mr. Kneip presented the Sources and Uses to Crown's Board Loan Committee ("BLC"), which approved them without modification.[54] The Sources and Uses were also provided to HVS, who used them in determining the feasibility and expected profit of the Project.[55]

Exhibit E to the Loan Commitment is entitled "Construction Addendum."[56] The Construction Addendum provides a lengthy list of "Required documentation for construction disbursement."[57] Exhibit E also provides that:

> Disbursements will occur within five business days of the receipt of a satisfactory CONSTRUCTION MANAGER. Retainage of 10% for each advance will be withheld. This retainage will be released when the construction management company signs off on the project, the borrower accepts the project, final lien waivers have been received and the permanent certificate of occupancy has been issued and confirmed.[58]

While Tetra Tec was mentioned in the Loan Commitment, Tetra Tec is not defined as or designated as the "Construction Manager" anywhere in the Loan Commitment. Evidence at the Loan Trial demonstrated that Crown and MRPC did not retain Tetra Tec. Instead, as discussed below, MRPC and Crown engaged in a modified Construction Manager process using Mr. Mirandi. The modified process began with Mr. Mirandi's inspection report as submitted to and reviewed by Crown and ending in a Construction Loan Advance Authorization Sheet.[59] Mr. Mirandi's site inspection would be necessary for

---

[53] JX800; JX82.
[54] JX22 at 4.
[55] JX779 at 39.
[56] JX800 at Exhibit E.
[57] JX800 at 1-2.
[58] JX800 at 2.
[59] *MRPC Christiana LLC*, 2017 WL 6606587, at *10.

15

disbursement of construction loan proceeds.[60]  Mr. Mirandi and others at Crown were

responsible for  "review of retainage status," "verify disbursement math," "review…lien

waivers."[61]

MRPC and Crown modified the Loan Commitment after May 31, 2012.[62]  On August 9,

2012, MRPC and Crown modified the Loan Commitment to extend the expiration date to

November 30, 2012.[63]  In addition, MRPC and Crown modified the Loan Commitment on

December 9, 2012 to extend the expiration date to December 31, 2012 (the "December LC

Modification").[64]

The December LC Modification also removed Tetra Tec.[65]  The December LC

Modification, in part, provides:

> Tetra Tec was originally approved to complete a plan and cost review, review draw
> requests and perform site inspections, and to provide a performance bond.  The
> Bank will engage its own construction consultant and Tetra Tec will not be used.
> The Borrower also obtained a performance bond separately, which must be
> approved by the Bank prior to closing.  The hard cost budget will be adjusted and
> $50,000 will be funded from the hard cost contingency line item to cover the
> $59,000 bond cost and $11,000 budget and draw request review fee being
> charged.[66]

MRPC was to obtain the performance bond.[67]  Crown was to fund $50,000.

Crown funded the $50,000 for the performance bond at closing but it is unclear whether

MRPC ever used that money to obtain a performance bond or used the funds elsewhere.[68]

---

[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] JX47.
[64] JX72.
[65] JX47.
[66] JX47; JX72.
[67] JX72 at 2; JX182 at Attachment C.
[68] JX437.

On or about December 10, 2012, Crown and the various borrowers and guarantors executed the December LC Modification.

Crown employed Mr. Mirandi as its construction consultant. Mr. Mirandi was a part-time employee.[69] Mr. Mirandi worked in construction his entire life, ascending from laborer to owning and managing engineering firms and construction companies.[70] Mr. Mirandi was familiar with the inspection process for commercial construction projects through his experience working through companies he owned or co-owned.[71] Mr. Mirandi had experience conducting inspections for architectural firms and engineering firms, including those certified on AIA documents.[72]

Mr. Mirandi performed construction inspections and prepared reports relating to construction draw requests for Crown.[73] With respect to the draw practice, Crown would notify Mr. Mirandi by telephone that an MRPC draw application was ready for review.[74] Mr. Mirandi would visit the Project and undertake the inspection. Mr. Mirandi would return to Crown's office to hand-deliver his inspection reports, typically at least a few days after he completed and signed his inspection report.[75] Mr. Mirandi testified that he was to submit a completed inspection report within a "reasonable time," which to him, meant whenever he was done with it.[76]

During the Loan Trial, Mr. Mirandi provided credible testimony that he carefully inspected the progress of the construction at the Project. Mr. Mirandi took his work seriously.

---

[69] JX72.
[70] *MRPC Christiana LLC*, 2017 WL 6606587, at *11.
[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] *Id.*

17

The Court found him to be a very credible witness.[77] Mr. Mirandi did not identify any below

standard work done by BCD or other subcontractors at the Project. The Court finds that Mr.

Mirandi would have noted any overbilling or fraudulent invoicing as it pertained to Draw

Requests, costs or completed work.

### b. The Loan Agreement

On December 19, 2012, Crown and MRPC executed and entered into the Loan

Agreement in the original principal amount of up to Twelve Million, Nine Hundred Eighty-Eight

Thousand  dollars ($12,988,000.00) (the "Loan").[78] MRPC was to use the proceeds from the

Loan for the acquisition of the Hotel, with its then existing 65 room hotel, from an entity

affiliated with or owned by a related third party.[79] MRPC also was to use the proceeds to expand

and re-flag the Hotel.[80]

Article IV of the Loan Agreement provides the relevant obligations of both parties as to

the funding or disbursement of the proceeds. Article IV, section 4.1 provides:

> Subject to the terms and conditions set forth in this Agreement, including, without
> limitation, the conditions set forth in Article V and VI hereof, Bank agrees to make
> disbursements to Borrower of the Loan funds up to the full amount set forth herein,
> in accordance with the Construction Cost Estimate set forth in Exhibit "C" pursuant
> to and subject to Borrowers' compliance with the following procedures . . . . [81]

Article IV, section 4.1(a)-(e) of the Loan Agreement goes on provide that Crown agrees

to make disbursements of funds to MRPC so long as MRPC complies with certain

procedures:

- prior to a disbursement, MRPC needs to complete, execute and deliver an
  application for an advancement (on Crown's standard form draw request) with

---

[77] *Id.*
[78] JX84.
[79] JX800 at 1.
[80] JX800 at 1; JX84.
[81] JX84 at 7.

18

copies of all valid building permits, approvals, and bring down of title and such other information requested by Crown (defined as a "Draw Request");

- if requested by Crown, the Draw Request must provide information regarding subcontractors to be paid through the Draw Request;

- the Draw Request must be in a form satisfactory to Crown, submitted at least five working days before the date when MRPC wants the funds and that there be no more than one Draw Request per month unless Crown elects otherwise;

- at Crown's discretion, each Draw Request is subject to an inspection report by Crown's consulting architect, engineer or representative certifying as to the progress of construction, the conformity of the construction to the plans, the quality and value of the work completed and the percentage of work completed, and certifying that the costs to be paid are costs set out in the trade cost breakdown and are costs incurred in connection with the planned construction; and

- special procedures for additional disbursements after initial disbursements of (i) $3,143,000 for purchase of the Hotel; (ii) $55,000 for eligible closing costs; (iii) $539,780 for eligible soft costs; and (iv) $9,250,000 for balance of construction and site improvements.[82]

In addition, Crown would only be advancing 90% of any approved Draw Request with the remaining 10% paid upon completion as evidenced by a permanent Certificate of Occupancy.[83] This provision addresses the Retainage sought by BCD in this civil action.

Article IV of the Loan Agreement goes on to govern the amount of funds to cover the construction ($9,250,220);[84] that funds will be made in accordance with Exhibit B ("Plans and Specifications"); and how the advances can be made and credited.[85]   Crown goes on to reserve its rights to make disbursements without complying with Article IV to protect the collateral, or

---

[82] JX84.

[83] JX84 at 7-8(Art. IV, sec. 4.1(f)).

[84] Article IV, section 4.4 provides that the $9,250,220 would be broken down as follows: (i) $7,963,720 for construction at the Hotel; (ii) $611,500 to fund an additional cash reserve account; (iii) $50,000 to fund a performance bond; and (iv) $625,000 for an interest reserve demand account for the initial 12-month construction period to be debited monthly.

[85] JX84 at 8 (Art. IV, secs. 4.4, 4.5 and 4.6).

19

that any advancement of Loan proceeds does constitute a waiver of Crown's rights with respect to future advances.[86]

MRPC and/or Crown failed to attach Exhibit B to the Agreement. Testimony at the Loan Trial demonstrated that the Plans and Specifications for the Hotel are attached to the AIA Contract (as defined below) as Attachments "B" and "F."[87] Exhibit B is the Drawing List, dated August 17, 2012. JX182 (Art. 9, secs. 9.1.4 and 9.1.5 and Attachment B).[88] Exhibit F is the Schedule of Values for the work to be done and totals $7,315,665.[89]

Article V of the Loan Agreement sets out the conditions precedent to Crown making of the initial advancement of funds, and Article VI relates to subsequent conditions precedent to Crown making subsequent advances. In addition, Article VII governs Default and Remedy. Article VII, section 7.1 asserts, in relevant parts, that the Borrower shall be in default under either of the following circumstances:

> (a) any default or event of default shall occur under any of the other Loan Documents or Borrower shall breach or fail to perform, observe or meet any covenant or condition made in any of the other Loan Documents and such default, event of default, breach or failure shall not have been cured prior to the expiration of any applicable cure period expressly provided in any of the Loan Documents; or
> (b) Borrower breaches or fails to perform, observe or meet any covenant or condition made in this Agreement; or
> ****
> (n) Borrower fails to close the SBA Loan and cause the SBA Loan to be funded to payoff the Interim Note on or before the Maturity Date . . . .[90]

---

[86] JX84 at 8-9 (Art. IV, secs. 4.7 and 4.8).
[87] *MRPC Christiana LLC*, 2017 WL 6606587, at *14; JX182.
[88] JX182.
[89] JX182 (Art. 4, sec. 4.1 and Attachment F).
[90] JX84 at 13-14.

20

Article VII, section 7.2 states that the occurrence of any default or event of default constitutes a default under each of the Loan Documents.[91] Article VII, section 7.5 provides that in the occurrence of default by MRPC, Crown:

> [s]hall be entitled to enter upon and assume possession of the Premises and protect, maintain, construct, install, and complete the Improvements in accordance with the Plans and such changes thereto as Bank may, from time to time, in its sole discretion, deem appropriate, all at the risk, cost and expense [sic] of Borrower… [f]or this purpose Borrower hereby irrevocably constitutes and appoints Bank its true and lawful attorney-in-fact with full power of substation to complete the Improvements in the name of Borrower and hereby empowers Bank, as said attorney, to take all action necessary in connection therewith…[92]

### 4. The AIA Contract

In August of 2012, MRPC hired BCD as its general contractor.[93] MRPC and BCD executed an AIA contract, later revised on October 9, 2012 (as revised, the "AIA Contract").[94] The AIA Contract was revised because Crown required that MRPC remove the bond from the hard cost budget and move the bond expense to soft costs so it could be paid at closing.[95] The AIA Contract fixed the price for the scope of work at $7,330,056.00.[96] Crown is not a party to the AIA Contract. Mr. Deignan, the president of Carrollton, acted as "project executive" for the Hotel.[97]

The date of commencement of construction under Section 3.1 of the AIA Contract between MRPC and BCD was to be thirty-days post-settlement, *i.e.*, January 19, 2013.[98] BCD projected eight (8) months for construction, rendering the projection completion date in

---

[91] JX84 at 14.
[92] JX84 at 14.
[93] *MRPC Christiana LLC*, 2017 WL 6606587, at *23.
[94] JX44.
[95] JX38.
[96] JX44 at 3.
[97] *Id.*
[98] JX182 at 2.

September of 2013.[99] Combined with contingency and an interest reserve, Crown committed to fund an additional $9,250,220.00.[100] The Loan Agreement provides how the $9,250,220.00 was to be allocated, of which up to $7,350,000.00 was for construction costs under the AIA Contract.[101]

Throughout the course BCD's work on the Hotel, Crown directly paid BCD after Crown approved a Draw Request.[102]

### 5. Construction at the Hotel

On January 24, 2013, a sprinkler pipe freeze and burst occurred at the Hotel (the "Sprinkler Incident").[103] The Sprinkler Incident happen before BCD had mobilized at the Hotel but after the date that the AIA Contract authorized BCD to commence work.[104] The following day, BCD sent an e-mail to MRPC providing notice that the Sprinkler Incident will have an impact on the construction schedule.[105] On January 28, 2013, MRPC forwarded BCD's notification to Crown.[106] Crown wanted the Project to proceed and intended to address the issue, if necessary, "closer to completion."[107]

MRPC and BCD agreed to address the Sprinkler Incident by creating construction change orders for additional construction work and costs.[108]

MRPC tracked the change orders for Sprinkler Incident costs and revisions to the construction project, which eventually increased the cost of the project by $2,219,944.00.[109] In

[99] JX36; JX84.
[100] JX84 at 8; JX800 at Ex. A.
[101] JX84 at 8; JX23 at Ex. A.
[102] Ex. 808; 8/18/21 Tr. 52:22-53:12 (Rodrigues).
[103] *MRPC Christiana LLC*, 2017 WL 6606587, at *23.
[104] JX198, JX203; 8/16/21 Tr. 22:6-10, 24:5-8, 25:3-7.
[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] *Id.*; JX200.
[109] *MRPC Christiana LLC*, 2017 WL 6606587, at *24.

addition, MRPC incurred an additional $2,150,000.00 from a different lender.[110]  Thus, by completion of the construction project, construction and renovation costs expanded by $4,369,944.00, or approximately 50% of the original budget of $9,250,220.00.[111]

BCD was not responsible procurement of the builders' risk insurance coverage for the damages.[112]  Crown understood that there would be extra costs, and likely delays, to the Project because of the sprinkler incident.  MRPC was handling the insurance recovery claims.[113]

The Court notes that the factual record is devoid of any contemporaneous claim that BCD was responsible for the Sprinkler Incident.  Crown appears to be the first party to make this allegation and only in connection with this civil action.

### 6. The Loan Modifications

By November of 2013, as the project neared the Original Completion Date as defined in the AIA Contract, the contingency amounts allowed under the Loan had been exhausted to cover change orders.[114]  BCD was uneasy regarding funding and frequently reached out to Crown for updates when its late payments would be made.[115]  Crown mostly refused to discuss funding with BCD because MRPC—and not BCD—was the borrower.[116]

Crown also had concerns whether sufficient funds were available to complete the Project and acknowledged a shortfall of approximately $1,527,000.[117]  Crown stated to MRPC that these issues were confidential and should be resolved between MRPC and the Bank.[118]

---

[110] *Id.*
[111] *Id.*
[112] JX182, JX945; 8/16/21 Tr. 25:3-7, 30:13-23.
[113] JX195, JX198; 8/17/21 Tr. 139:16-140:1.
[114] JX414.
[115] JX338, JX835, JX837; 8/16/21 Tr. 51:13-16.
[116] JX835, JX481, JX482.
[117] JX938; 8/17/21 Tr. 174:19-175:4.
[118] JX835.

Throughout late 2013 and into early 2014, MRPC made promises to BCD regarding payment.[119] Given the consistently late payments or nonpayment of invoices, BCD sought confirmation from Crown that there was sufficient funding and that it would get paid.[120]

In February 2014, BCD contacted Crown's chief credit lending officer, Tim Doyle.[121] BCD was attempting to determine why BCD was not getting payment on approved Draw Requests.[122] Mr. Deignan asked Mr. Doyle if there were any funding problems with the Project.[123] Mr. Deignan inquired as to whether MRPC was in default on its loan or if there was any other reason why Crown was not making payment on BCD's approved Draw Requests.[124] Mr. Doyle responded that he was unaware of any facts that indicated that MRPC was in default.[125] Mr. Doyle later reached out to Mr. Deignan on this issue. Mr. Doyle stated that it was clear that the Project was substantially complete, and that there appeared to be a substantial amount of equity.[126]

Crown and MRPC negotiated, and ultimately reached an agreement to extend the Loan.[127] On May 2, 2014, Crown and MRPC executed and entered into a Modification of Note Agreement (the "May Modification"), which in part extended the maturity date of the Loan to October 31, 2014.[128] After the May Modification, Crown advanced an additional $2,483,215.53 in disbursements to MRPC.[129]

---

[119] 8/16/21 Tr. 59:11-22.
[120] 8/16/21 Tr. 59:11-22.
[121] 8/16/21 Tr. 59:21-60:1; JX952; JX953.
[122] 8/16/21 Tr. 60:3-10; 18-20.
[123] 8/16/21 Tr. 60:3-10; 18-20.
[124] 8/16/21 Tr. 60:3-10; 18-20.
[125] 8/16/21 Tr. 60:21-61:2.
[126] JX953.
[127] JX531.
[128] JX531 at 1.
[129] JX662.

Crown and MRPC did approach BCD during negotiations over the May Modification. Crown's BLC considered the loan modification and approved the modification subject to certain conditions.[130] One condition was that MRPC obtain BCD's agreement that BCD's retainage would be paid from the insurance proceeds related to the sprinkler incident.[131] Another condition was that BCD obtain payment and performance bonds in the amount of $9.9 million naming Crown Bank as the beneficiary.[132]

MRPC shared with BCD drafts of loan modification documents.[133] On March 5, 2014, BCD notified Crown Bank and MRPC that BCD would not agree to conditions requiring BCD to agree to bonding requirements except as set out in the AIA Contract.[134] In addition, BCD stated that it would not agree to having retainage paid out of the insurance proceeds.[135]

The May Modification did not provide for any additional funds for Project.[136] Instead, the May Modification replenished the Interest Reserve, and used the CD to establish a P&I reserve.[137] The May Modification defunded the construction loan of the Retainage and reallocated it to pay for costs related to the Project.[138] Crown Bank admitted, at the Trial, that the CD was never used to pay the Retainage. Crown Bank retained the CD (in the amount of $1.5 million) after MRPC defaulted on the Loan.[139]

Crown and MRPC needed to modify the Loan later in 2014. At MRPC's request, the parties agreed to extend the loan again to allow the construction to continue.[140] On September

---

[130] JX441.
[131] JX441; 8/17/21 Tr. 154:13-19.
[132] JX 441; 8/17/21 Tr. 154:13-19.
[133] JX481.
[134] JX481; 8/17/21 Tr. 178:12-21.
[135] JX481; 8/17/21 Tr. 178:12-21 and 179:17-180:1.
[136] JX531; 8/17/21 Tr. 189:7-12, 191:14-18.
[137] JX531.
[138] JX 531; 8/18/21 Tr. 192:1-14.
[139] 8/17/21 Tr. 163:1-14.
[140] JX595.

29, 2014, Crown and MRPC executed and entered into a Modification of Note Agreement (the "September Modification"), which in part extended the maturity date of the Notes to January 31, 2015 when all amounts owed thereunder were to be paid.[141] The September Modification also granted MRPC the option to request an additional three-month extension.[142]

### 7. Payment and Performance Bonds

BCD expected to provide payment and performance bonds on the Project and had the capacity to do so.[143] However, BCD did not initially provide performance bonds because neither MRPC nor Crown funded payment for the bonds.[144]

On November 25, 2013, when BCD had performed seventy-five percent of the work on the Project, it received correspondence from its bonding agent that the payment and performance bonds had not been paid for or executed.[145]

BCD ultimately provided the payment and performance bonds; however, the bonds were somewhat different than BCD had expected at the initiation of the Project.[146]

Specifically, Crown requested to be named as a dual obligee and dual beneficiary, which was unusual as the beneficiary is typically just the owner (i.e. MRPC).[147] This was the first time BCD had ever received a request from a lender to be named as a dual obligee/beneficiary.[148]

BCD's bonding company agreed to add Crown as a dual obligee but did not agree to add Crown as a dual beneficiary, which resulted in a benefit to Crown by diminishing its risk substantially.[149]

---

[141] JX595.
[142] JX595 at 1.
[143] 8/16/21 Tr. at 70:4-10.
[144] 8/16/21 Tr. at 70:12-19.
[145] JX826; 8/16/21 Tr. at 70:20-71:15.
[146] 8/16/21 Tr. at 72:20-73:9.
[147] 8/16/21 Tr. at 73:1-6.
[148] 8/16/21 Tr. at 73:7-9.
[149] 8/16/21 Tr. at 73:10-13.

## 8.  BCD's Recommencement of Work in 2014

Prior to the May Modification, BCD notified MRPC that to resume work, BCD must be paid $782,577.98—an amount equal to unpaid past payment applications on April 9, 2014.[150] BCD again emphasized that the Retainage would be paid to BCD as set forth in the Loan Agreement and not by any other terms.[151]

On April 10, 2014, MRPC and BCD informed Crown that BCD would not accept any form of payment that relied on insurance proceeds or any other form of funds that were not currently in hand.[152]  Crown did not disagree with this process of paying BCD.[153]

BCD agreed that most of the Retainage could be held in escrow and the retainage would be paid to BCD up to sixty days after delivery of the Certificate of Occupancy.  The remaining Retainage was to be paid pursuant to the AIA Contract and/or the Loan Agreement.[154]  BCD stated it would not accept insurance proceeds as the Retainage.[155]

Given the frequent payment issues on the Project, BCD again sought assurance that Crown would release the funds for BCD's final payment.[156]  In addition, BCD wanted reassurance that the Retainage would be held in escrow with a third party.[157]

Mr. Deignan stated that, by the fall of 2014, BCD did not know that earned and unpaid Retainage was no longer in a Crown segregated account.[158]  Mr. Deignan further testified that had BCD known that fact there was no separate retainage account, BCD would have stopped the

---

[150] JX502.
[151] JX502; 8/16/21 Tr. 66:18-67:2.
[152] JX857; JX854; 8/16/21 Tr. 77:15-78:4.
[153] 8/16/21 Tr. 83:15-20.
[154] JX857; JX854.
[155] 8/16/21 Tr. 83:15-20.
[156] 8/16/21 Tr. 85:13-86:3.
[157] 8/16/21 Tr. 85:13-86:3.
[158] 8/16/21 Tr. 79:21-80-5; 92:16-21.

Project immediately.[159] BCD consistently believed that Crown had withheld and segregated the Retainage pursuant to the Loan Commitment and that it would be released upon issuance of the Certificate of Occupancy.[160]

### 9. Substantial Completion and Fall 2014 Payment Issues

On October 7, 2014, BCD again sought assurances concerning MRPC's ability to provide funding for completion of the Project.[161] BCD requested information as to funding for potential and pending change orders and extended general conditions.[162] BCD requested this to confirm there were no funding issues that would impair Project completion.[163]

In the final quarter of 2014, BCD estimated the Hotel was approximately 80% complete.[164]

On December 2, 2014, MRPC wrote to Crown that there was a shortfall of $703,574.93, and recommended steps to complete the Hotel.[165] MRPC communicated that the costs remaining to be complete the Hotel included the Retainage in the amount of $955,000.00.[166]

In addition, Starwood, the Hotel's franchisor, required MRPC to schedule staff training prior to opening.[167] Starwood expected that MRPC would obtain a Temporary Certificate of Occupancy by December 23, 2014.[168] If MRPC did not obtain the Temporary Certificate of Occupancy, Starwood intimated that the Hotel would be decommissioned prior to the planned January 8, 2014 opening.[169]

---

[159] 8/16/21 Tr. 79:21-80-5; 92:16-21.
[160] 8/16/21 Tr. 87: 2-14; 89:2-11.
[161] JX605.
[162] JX605.
[163] 8/16/21 Tr. 96:3-6.
[164] 8/16/21 Tr. 101:20-23.
[165] JX639; 8/18/21 Tr. 23:1-20.
[166] JX639.
[167] 8/16/21 Tr. 109:20-110:3.
[168] 8/16/21 Tr. 109:20-110:3; Ex. 892.
[169] JX888; JX892.

On December 17, 2014, Crown requested that MRPC send a completed up-to-date package of financial information for completing the secondary SBA loan transaction.[170] In response, MRPC requested that Crown confirm (i) the Hotel completion costs and (ii) that the Retainage ($955,000) would be satisfied from the $1.5 million CD.[171] On December 18, 2014, Crown prepared an amendment to the loan, which acknowledged that BCD was owed Retainage in the amount of $955,000.[172] Also on December 18, 2014, MRPC notified Crown that it would be prudent to reserve the $955,000 for the Retainage.[173]

**10. December 20, 2014 Meeting at the Project Site and Agreement Between BCD and Crown**

On December 18, 2014, Crown requested a meeting with MRPC and BCD.[174] Crown asserted that a meeting with Mr. Rodrigues was necessary to discuss the loan modification and to sign documents.[175] MRPC responded to the request, advising Crown that BCD would not sign any documents without its attorney's review.[176] As such, MRPC requested a draft version of the modification to review prior to any meeting.[177] Crown responded and relayed that it was not expecting BCD to sign anything at the meeting; however, Crown wanted to know that BCD agreed with "the resolution" for completion.[178] Crown reiterated that it wanted a meeting with

---

[170] JX894.
[171] JX894.
[172] JX657.
[173] JX895.
[174] JX893. At trial Mr. Rodrigues initially testified that Mr. Patel of MRPC requested the December 20, 2014 in-person meeting and not Crown. 8/18/21 Tr. 24:22-25:3. Further, Mr. Rodrigues testified in a prior deposition that he did not know why Crown wanted the meeting to be in person (8/18/21 Tr. 28:7-13), yet at trial Mr. Rodrigues testified that Mr. Patel requested and controlled the meeting, that he and Mr. Deignan did not speak much, and that the meeting was to discuss TD Bank. 8/18/21 Tr. 29:11-30:1; 8/17/21 Tr. 111:23-112:3; 114:7-12, 18-19. Mr. Patel confirmed that he did not demand the meeting, and that Mr. Rodrigues initially demanded the meeting. 8/18/21 Tr. 132:8-13, 135:4-12. The Court finds that the testimony of Mr. Deignan and Mr. Patel to be credible. The Court does not find the testimony of Mr. Rodrigues to be credible on the facts surrounding the December 20, 2014 meeting. Given events at the Trial, the Court finds that Mr. Rodrigues was not entirely truthful when testifying.
[175] JX893.
[176] JX893; 8/18/21 Tr. 127:21-128:3.
[177] JX893; 8/18/21 Tr. 127:21-128:3.
[178] JX893.

all parties "ASAP."[179]  Crown stated that the topic(s) for the meeting were "too important to have a phone conversation" and requested an in-person meeting.[180]

BCD did not know what Crown meant by "the resolution."[181]  Shortly after, MRPC confirmed that the call/meeting was simply to confirm an escrow agreement for the Retainage in exchange for the Temporary Certificate of Occupancy instead of BCD holding the Temporary Certificate of Occupancy until BCD received the Retainage.[182]  BCD was aware that Crown and MRPC needed BCD to obtain the Temporary Certificate of Occupancy to maintain the current dates with Starwood and to close the secondary SBA loan and financing.[183]

On or about December 20, 2014, Mr. Deignan, Mr. Rodrigues, and Mr. Patel met at the Hotel.[184]  At the meeting, Mr. Rodrigues conveyed to Mr. Deignan that he understood the Hotel had problems, including cost overruns.[185]  Mr. Rodrigues wanted to know from Mr. Deignan how soon BCD could deliver a Certificate of Occupancy.[186]

Mr. Deignan indicated that BCD could deliver the Temporary Certificate of Occupancy subject to certain conditions, *i.e.*, payment of BCD's December Draw Request and the Retainage.[187]  Mr. Rodrigues promised Mr. Deignan that, in exchange for the Temporary Certificate of Occupancy, Crown would pay the December Draw Request immediately, and that the Retainage would be paid in approximately sixty days when the SBA loan was scheduled to close (together with Mr. Deignan's promise, "the December Agreement").[188]  The December

[179] JX893.
[180] JX895.
[181] 8/16/21 Tr. 107:1-3.
[182] JX893; 8/18/21 Tr. 131:18-132:2.
[183] 8/16/21 Tr. 105:9-21; 110:8-12; 116:4-10.
[184] 8/16/21 Tr. 110:13-18; 8/18/21 Tr. 135:13-18.
[185] 8/16/21 Tr. 111:13-112:3; 8/18/21 Tr. 136:9-12.
[186] 8/16/21 Tr. 111:13-112:3; 8/18/21 Tr. 136:9-12.
[187] 8/16/21 Tr. 112:3-16; 8/18/21 Tr. 136:13-14.
[188] 8/16/21 Tr. 112:10-16; 8/17/21 Tr. 55:14-20; 8/18/21 Tr. 136:9-137:7.

Agreement was simple and included no additional terms or conditions.[189] On December 20, 2014, Mr. Deignan and Mr. Rodrigues seemed to be in harmony as to the December Agreement's terms and condition but did not immediately memorialize it with a written document and signatures.[190]

Mr. Deignan testified that he believed Mr. Rodrigues.[191] Mr. Deignan also stated that he relied on Mr. Rodrigues' promise that BCD would be paid its December Draw Request immediately and the Retainage in approximately two months in exchange for completion of the Hotel and the Temporary Certificate of Occupancy.[192] BCD thought that the SBA loan closing was simply a convenient timing mechanism for Crown and that BCD would be paid its retainage within approximately sixty days.[193] BCD never believed that the SBA loan closing was a condition of the retainage payment. Mr. Deignan testified that BCD would not have turned over the Temporary Certificate of Occupancy unless BCD was to be paid with or without the SBA financing.[194]

MRPC and Crown also discussed a potential loan modification.[195] Mr. Deignan was not involved in these discussions.[196]

BCD viewed the December 20, 2014 as having two objectives.[197] The first was for BCD to confirm that it would complete the Project and obtain the Temporary Certificate of Occupancy.[198] The second was for Crown to affirm that BCD would get paid its final bill and

---

[189] 8/16/21 Tr. 124:19-125:4.
[190] 8/16/21 Tr. 125:13-23; 128:4-11; 8/18 Tr. 136:23-137:7.
[191] 8/16/21 Tr. 113:1-6; 125:13-19; 8/18/21 Tr. 137:1-4.
[192] 8/16/21 Tr. 113:1-6; 125:13-19; 8/18/21 Tr. 137:1-4.
[193] 8/16/21 Tr. 113:7-20; 125:5-12.
[194] 8/16/21 Tr. 114:7-9; 8/18/21 Tr. 137:1-4.
[195] 8/16/21 Tr. 105:9-11; 8/18/21 Tr. 148:2-15.
[196] 8/16/21 Tr. 105:9-11; 8/18/21 Tr. 148:2-15.
[197] 8/17/21 Tr. 54:1-9, 105:9-11.
[198] 8/17/21 Tr. 54:1-9, 105:9-11.

the retainage.[199]  As set out below, BCD provided the Temporary Certificate of Occupancy on December 23, 2014, and subsequently a Certificate of Occupancy for the restaurant on January 8, 2015.[200]  BCD did not get paid its final bill or the retainage.[201]

### 11. Events after the December 20, 2014 Meeting

On December 22, 2014, Mr. Rodrigues corresponded with BCD and MRPC and memorialized the December Agreement from the December 20, 2014 meeting.[202]  BCD responded to Crown and MRPC and noted that Mr. Rodrigues included new topics and terms that were not included in the December Agreement between Crown and BCD.[203]  BCD highlighted that BCD never agreed to tie receipt of the Retainage to any other obligations between MRPC and Crown unrelated to BCD.[204]  MRPC acknowledged that Mr. Rodrigues' December 22, 2014 correspondence did not represent the December Agreement reached at the meeting.[205]

Crown did not respond.  On January 12, 2015, BCD informed Crown that the Temporary Certificate of Occupancy had been obtained.[206]  BCD asked that Crown call BCD to discuss documentation for the final release of the Retainage and payment for the final December Draw Request.[207]

---

[199] 8/17/21 Tr. 54:1-9, 105:9-11.
[200] Ex. 666, 683.
[201] Ex. 667; 8/16/21 Tr. 120:3-6; 121:2-5; 123:14-16.
[202] Ex. 957; 8/16/21 Tr. 121:15-17; 8/18/20 Tr. 33:22-34:9 (Rodrigues). During his testimony, Mr. Rodrigues initially stated that he did not correspond with Mr. Deignan after the December 21, 2014 meeting; however, Mr. Rodrigues' December 22, 2014 email was discovered after Mr. Rodrigues' testimony, thereby contradicting his testimony. 8/17/21 Tr. 117:4-15.  As noted above, the Court finds that Mr. Rodrigues was not entirely forthcoming or truthful when testifying and does not find Mr. Rodrigues to be a credible witness.
[203] JX667; 8/16/21 Tr. 124:2-7.
[204] 8/16/21 Tr. 124:15-18.
[205] 8/18/21 Tr. 150:9-15.
[206] JX686; 8/16/21 Tr. 126:6-18.
[207] JX686; 8/16/21 Tr. 126:6-18.

On January 23, 2015, BCD wrote to Crown and MRPC and informed them that BCD should be paid $128,677.91 under final December Draw Request.[208] BCD reiterated that the Retainage should be released at the time scheduled for the SBA settlement.[209]

Crown did not execute the January 23, 2015 correspondence relating to the December Agreement.[210] On February 6, 2015, Crown requested that all further correspondence from BCD be sent to Crown's lawyers.[211]

At trial, Mr. Deignan testified that he was shocked when BCD received this communication.[212] Mr. Deignan believed that BCD and Crown had an agreement to pay BCD its final bill and the Retainage.[213]

On or about January 6, 2015, the Hotel received the Temporary Certificate of Occupancy.[214] On or about January 8, 2015, the Hotel received its final Certificate of Occupancy.[215] On or about that same date, the Hotel received franchise approvals to open for business and opened for business for hotel guests.[216]

The Loan matured on January 31, 2015.[217] MRPC did not close on the SBA Loan. MRPC did not make payment to Crown upon maturity of the Notes.[218]

Crown obtained a judgment against MRPC in the principal balance amount of $12,988,000.00—the full amount of the Loan.[219] This amount, in essence, includes the

---

[208] JX709; 8/16/21 Tr. 128:16-23; 129:23-130:8.
[209] JX709; 8/16/21 Tr. 128:16-23; 129:23-130:8.
[210] JX709; 722; 8/16/21 Tr. 131:22-132:4; 133:3-4.
[211] JX709; 722; 8/16/21 Tr. 131:22-132:4; 133:3-4.
[212] 8/16/21 Tr. 132:5-15.
[213] 8/16/21 Tr. 132:5-15.
[214] *MRPC Christiana LLC*, 2017 WL 6606587, at *27.
[215] *Id.*
[216] *Id.*
[217] *Id*. at *28.
[218] *Id.*
[219] *Id*. at *34; JX956.

33

Retainage and the unpaid final bill of BCD even though Crown did not actually pay those to MRPC or BCD. At the Trial, Crown did not provide a fulsome response on why it records the debt in the full amount of the Loan even though Crown never paid the Retainage or the December Draw Request.

### C. CONCLUSIONS ON CLAIMS OF PLAINTIFFS AND CROWN

### 1. BCD's Claims

#### a. Count I – Breach of Contract.

After considering the evidence and the applicable law, the Court finds that BCD proved that Crown breached contractual obligations owed to BCD.

The controlling documents are the Loan Commitment and the Loan Agreement. The Court recognizes that BCD is not a named party in those agreements. Moreover, the Court acknowledges that the Loan Agreement specifically provides that there are no third-party beneficiaries to the Loan Agreement. But, contractually, factually and practically, BCD is the intended third-party beneficiary to the Loan Commitment and the Loan Agreement. Moreover, MRPC and Crown treated BCD as a third-party beneficiary to the applicable agreements.

Under New Jersey law, a third-party beneficiary is a person or entity that "the contracting parties intended . . . should receive a benefit which might be enforced in the courts."[220] The Loan Agreement may have a provision that states there are no third-party beneficiaries, but the remaining terms and conditions of the Loan Commitment and the Loan Agreement provide otherwise.

---

[220] *Broadway Maint. Corp. v. Rutgers, State Univ.*, 447 A.2d 906, 909 (N.J. 1982). Moreover, New Jersey law recognizes that parties to a contract can be liable to third parties. New Jersey statutory law provides that "a person for whose benefit a contract is made may sue on the contract in any court. N.J. Stat. 2A:15-2. This statute restates New Jersey common law that third-party beneficiaries may sue upon a contract made for their benefit without privity of contract." *Rieder Communities, Inc. v. Twp. of N. Brunswick,* 546 A.2d 563, 566-67 (NJ App. Div. 1988).

Crown and MRPC entered the Loan Agreement for the purpose of providing funding for completion of the reflagging of the Hotel. The Loan Agreement and Loan Commitment recognize that MRPC would retain a contractor for the Hotel. Exhibit E to the Loan Commitment is entitled "Construction Addendum." The Construction Addendum provides that a construction manager will review work on the Hotel and disbursements will be made. Next, the Construction Addendum specifically references "retainage" and release of the retainage upon acceptance of the project (i.e., the Hotel), final lien waivers and receipt of a certificate of occupancy. The Construction Addendum expressly recognizes payment of the Retainage to BCD. Finally Exhibit B to the Loan Agreement is made part of the AIA Agreement.

The Loan Agreement, at Article IV, addresses funding of construction costs, disbursement and retainage. Crown agreed to fund construction costs upon the satisfaction of certain conditions, *e.g.*, approval of a Draw Request. Article IV, section 4.1(f), addresses the Retainage—Crown would only be immediately advancing 90% of an approved Draw Request with the remaining 10% to be paid upon completion of the Hotel as evidenced by a permanent Certificate of Occupancy. Article IV also provides that Crown can make disbursements to MRPC or directly to the contractor or suppliers.

Crown chose to pay BCD directly. At this point in time, MRPC and Crown made BCD an intended beneficiary of a benefit under the Loan Commitment and Loan Agreement. Crown "cut out the middle man" and paid BCD for work completed and approved by Crown. Crown held on to the Retainage. BCD had a right to that Retainage upon completion of the Hotel and a Certificate of Occupancy. Crown would be the party that paid BCD the Retainage.

The Court finds that BCD completed all the work agreed to under the AIA Agreement and the Loan Commitment and Loan Agreement. BCD delivered a fully functioning Hotel to

35

MRPC and Crown. Crown approved all monies owed to BCD, including the December Draw Request. BCD met its contractual obligations. Crown did not meet its contractual obligations. Crown did not pay the Retainage. Moreover, Crown did not pay the outstanding amount of $128,677.91 for work done by BCD and approved by Crown.

BCD completed its contractual scope of work on the Hotel and obtained the Temporary Certificate of Occupancy on December 23, 2014. The Certificate of Occupancy for the restaurant on the Hotel was issued on January 8, 2015. The permanent Certificate of Occupancy was issued on April 20, 2015. The Loan Agreement's conditions for payment have been satisfied. Crown did not pay. Crown's failure to pay BCD constitutes a breach of contract and, and as a result, BCD has suffered damages in the amount of $1,083,677.91.

The Court could stop at this point. The Court, however, notes that Crown takes the position that BCD cannot pursue contractual claims, nor can BCD pursue "quasi-contractual" claims like unjust enrichment and promissory estoppel because contracts exist that control here. Specifically, Crown argues that no contract exists between BCD and Crown and then argues that BCD's claims for unjust enrichment and promissory estoppel are unavailable because valid contracts, the Loan Agreement and the AIA Contract, exist that controls BCD's claims. As Crown argues, Crown could have economically damaged BCD, but BCD would have no right or remedy except as to MRPC. Therefore, for purposes of completeness, the Court will address BCD's noncontract claims as alternative claims for relief.

### b. Count II—Unjust Enrichment

After considering all the evidence and the applicable law, the Court finds that BCD proved that Crown has been unjustly enriched by failing to pay the Retainage and the final December Draw.

The Court agrees with BCD that its unjust enrichment claim is like the concept of a constructive trust. Pursuant to the Loan Agreement, Crown made direct payment to BCD on approved Draw Requests. Crown held back the Retainage as set out in the Loan Agreement; however, the Retainage is not Crown's money. The Retainage is money earned by BCD for goods and services provide with respect to the Hotel. Crown held the Retainage in trust and was supposed to segregate the Retainage. Moreover, Crown has represented in other proceedings that it lent the full amount of the Loan which includes payment of the Retainage and the December Draw Request.

If Crown were allowed to keep the Retainage, Crown would be unjustly enriched to the detriment of BCD. For example, Crown could recover all amounts owed to it by foreclosing on collateral and through other sources. Were that to happen, Crown would get paid on monies that it never advanced to BCD. Crown cannot claim it is owed for money advanced—*i.e.*, the Retainage and the December Draw—when it never paid those amounts to MRPC or BCD.

The factual record demonstrates that Crown was enriched by BCD's completion of its contract work on the Hotel and the Temporary Certificate of Occupancy. BCD provided MRPC and Crown with beneficial occupancy of the Hotel for all intents and purposes. Without BCD's cooperation in completing its scope of work, the Hotel would never have been granted a Certificate of Occupancy. BCD was impoverished by completing the work and not getting paid the Retainage or the December Draw Request. Crown, who undertook the obligation to pay BCD directly, has not provided justification for its failure to pay the amounts owed to BCD. The Court, therefore, finds that it is unjust for Crown to retain the amounts owed. Accordingly, the Court finds that BCD is entitled to recovery of $1,083,677.91 under the theory of unjust enrichment.

37

### c. Count III—Promissory Estoppel

The Court finds that BCD has proved its promissory estoppel claim against Crown. Under Delaware law, BCD needs to demonstrate that: (i) Crown made a promise to BCD; (ii) Crown reasonably expected BCD to act on the promise; (iii) BCD reasonably relied on Crown's promise and took action to its detriment; and (iv) Crown's promise is binding because injustice can be avoided only by enforcement of the promise. The promise is the December Agreement between Crown and BCD made at the December 20, 2014 meeting.

Mr. Deignan, Mr. Rodrigues, and Mr. Patel met at the Hotel on December 20, 2014. At the meeting, Mr. Rodrigues wanted to know from Mr. Deignan how soon BCD could deliver a Certificate of Occupancy. Mr. Deignan indicated that BCD could deliver the Temporary Certificate of Occupancy subject to certain conditions, *i.e.*, payment of BCD's December Draw Request and the Retainage. Mr. Rodrigues promised Mr. Deignan that, in exchange for the Temporary Certificate of Occupancy, Crown would pay the December Draw Request immediately, and that the Retainage would be paid in approximately sixty days when the SBA loan was scheduled to close. The December Agreement was simple and included no additional terms or conditions. Mr. Patel confirmed the existence of the December Agreement. Moreover, BCD's subsequent conduct confirms the existence of the December Agreement.

Mr. Deignan testified that he believed Mr. Rodrigues. Mr. Deignan also stated that he relied on Mr. Rodrigues' promise that BCD would be paid its December Draw Request immediately and the Retainage in approximately two months in exchange for completion of the Hotel and the Temporary Certificate of Occupancy. BCD thought that the SBA loan closing was a timing mechanism for Crown and MRPC. Mr. Deignan stated that he never believed that the SBA loan closing was a condition of the retainage payment. Mr. Deignan testified that BCD

38

would not have turned over the Temporary Certificate of Occupancy unless BCD was to be paid with or without the SBA financing.

The Court notes that Crown's evidence as to the December Agreement must be disregarded or discounted entirely. Mr. Rodrigues did not credibly testify as to the December Agreement. As such, the Court relied upon the exhibits and the testimony of Mr. Deignan and Mr. Patel.

BCD was not getting paid and did not receive satisfactory answers to its questions about the Retainage. Work on the Hotel was basically complete. BCD could have stopped performing and not delivered a completed Hotel that eventually received the Temporary Certificate of Occupancy and, subsequently a Certificate of Occupancy. BCD performed. Crown promised to get BCD its monies if BCD performed. Crown did not fulfill its promise. Crown's promise is binding otherwise Crown will get the benefit of the promise without paying for it. Moreover, Crown has sought recovery of these amounts against MRPC even though it never paid the money to MRPC or BCD.

### d. Count IV--Misrepresentation

The Court finds that BCD has not carried its burden on Count IV. BCD contends that Crown made a promise to pay BCD the Retainage and the December Draw at the December 20, 2014 meeting. The Court finds that BCD proved that Crown made this promise; however, BCD has failed to factually demonstrate that Crown made this promise with the requisite fraudulent intent. The factual record does not support the conclusion that Mr. Rodrigues made his promise to pay with knowledge that the promise was false when made.

BCD argues that Mr. Rodrigues made the promise to pay and then did not pay and, therefore, it was a false promise. BCD fails to account for the events that happened in January.

39

First, BCD did obtain the Temporary Certificate of Occupancy. This alone would not have triggered payment even under the December Agreement. More was necessary. Next, MRPC never entered into the proposed final modification that was initiated on December 17, 2014. Instead, MRPC cut off communications with Crown and then sued Crown. Mr. Rodrigues could not have anticipated that this would happen on December 20, 2014. On December 20, 2014, BCD, MRPC and Crown appeared to have struck a compromise deal. The evidence suggests that if MRPC and Crown had entered into the final modification then Crown would have completed its deal with BCD.

BCD needed to prove: (i) the existence of a false representation, usually one of fact, made by Crown (Mr. Rodrigues); (ii) that Crown had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (iii) that Crown had the intent to induce BCD to act; (iv) that BCD acted; and (v) that BCD suffered damages because of such reliance. As discussed above, Crown made a promise to induce BCD to act, BCD did act, and BCD suffered damages. Where a speaker makes a promise with no intention of performing the promise, there is a valid claim for misrepresentation; however, the Court finds that the facts do not prove that Crown, through Mr. Rodrigues, made a promise with no intention of performing that promise. On December 20, 2014, the facts indicate that Crown made the promise with the intent to follow through but that events occurred that interfered with the ability to follow through in January or February.

**2. Crown's Counterclaims**

    **a. Counterclaim I—Fraud**

The Court finds that Crown did not prove that BCD committed fraud as against Crown. Taken in isolation, Crown argues that it was defrauded into making additional disbursements under the Loan that it would not have made if fully aware of the facts.

The facts in this Trial and the Loan Trial just do not support that narrative. Crown was a very active participant in the events surrounding the Hotel. MRPC notified Crown of the Sprinkler Incident on January 28, 2013. MRPC, BCD and Crown knew that the Sprinkler Incident would require changes in timing and funding. Crown wanted the Hotel work to continue and that the parties would address the issues, if necessary, closer to completion.

Crown monitored the Hotel closely through the Draw Request process. This process was addressed in length during the Loan Trial but ignored by Crown during the Trial. Crown retained Mr. Mirandi to make site visits on a regular basis. Mr. Mirandi would review work done, take photos, review invoices. Crown would obtain lien waivers. Certifications had to be made. Crown did not make one payment to BCD before undertaking this process.

Finally, Crown and MRPC formally modified the Loan Agreement on two occasions and would have done a final one in January 2015. This final loan modification was derailed when MRPC chose the "nuclear option" of suing Crown instead of signing the modification. The evidence is clear that Crown continued to lend over issues regarding cost overruns and invoicing. Crown was willing to modify the Loan even after MRPC violated the Loan Agreement as to cash collateral. Moreover, the failed "Proposed December Loan Modification" was initiated on or about December 17, 2014 when all outstanding amounts to complete the Hotel, including the Retainage, were disclosed and known.

As such, even if Crown could show that BCD knowingly made false statements to induce Crown into action, Crown cannot show justifiable reliance. Crown was a knowing participant in the Hotel, albeit as the lender. Crown modified the Loan Agreement over the Sprinkle Incident and other cost issues. Crown reallocated the Loan proceeds but did not advance any additional funds over the original Loan amount of $12,988,00. Crown, through Mr. Mirandi, closely monitored the construction of the Hotel. Mr. Rodrigues met with MRPC and BCD on December 20, 2014 and agreed to pay the Retainage and the December Draw with full knowledge of all issues with the Loan and the Hotel. If Crown was defrauded, Crown did so willingly.

Understand, the Court is not finding that BCD knowingly made false statements to Crown. The Court is not finding that BCD made false statements to Crown to induce Crown to act. Crown relies too much on innuendo and unsupported conclusions rather than facts to demonstrate fraudulent intent in its counterclaim. The Court is finding that even if other element of a fraud claim were satisfied, Crown cannot show justifiable reliance. For these additional reasons, Crown's fraud counterclaim fails.

### b. Counterclaim II—Civil Conspiracy

Because the Court has found against Crown on Counterclaim I, the Court must find against Crown on its civil conspiracy counterclaim. A claim for civil conspiracy is not an independent cause of action, and must instead arise from an underlying wrong.[221] Crown has not proven its fraud claim so there is no underlying wrong to support the civil conspiracy counterclaim.

---

[221] *Id.*; *see also Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998) (holding that where a complaint fails to state a claim as to an underlying tort, a civil conspiracy claim must be dismissed); *Outdoor Techs., Inc. v. Allfirst Fin., Inc.*, 2001 WL 541472, at *6 (Del. Super. Apr. 12, 2001) (granting summary judgment on fraud and civil conspiracy claims stating that where a fraud claim is not viable as a matter of law, the accompanying civil conspiracy claim must also fail as there is no independent tort to sustain it).

42

## VI.    CONCLUSION

The Court finds in favor of BCD and against Crown on Count I.  In the alternative, the Court finds in favor or BCD and against Crown on Counts II and III.  The Court finds in favor of Crown and against BCD on Count IV.  The Court finds against Crown and in favor of BCD on Counterclaims I and II.

Judgement shall be entered in favor of BCD in the amount of $1,083,677.91 plus appropriate statutory pre-judgment interest and costs.  BCD should submit a form of judgment within ten (10) day of this decision.

Dated: May 2, 2022
Wilmington, Delaware

/s/ Eric M. Davis
Eric M. Davis, Judge